U.S. TERM LIMITS, INC., et al. *v.* Bobbie E. HILL, et al.

93-1240 872 S.W.2d 349

Supreme Court of Arkansas
Opinion delivered March 7, 1994
[Rehearing denied March 14, 1994.*]

*Petition of State of Arkansas: Special Chief Justice George K. Cracraft and Special Justices Ernie Wright and Gerald Brown join. Special Justice Carl McSpadden would grant rehearing. Holt, C.J., and Newbern, Glaze, and Corbin, JJ., not participating.

Petition of U.S. Term Limits, Inc., et al.: Cracraft, Sp. C.J., and Wright, Brown, and McSpadden, Sp. JJ., join. Hays, J., would grant. Holt, C.J., and Newbern, Glaze, and Corbin, JJ., not participating.

Petition of Senatorial Unified Members: Cracraft, Sp. C.J., and Wright and Brown, Sp. JJ., join. McSpadden, Sp. J., would grant rehearing. Holt, C.J., and Newbern, Glaze, and Corbin, JJ., not participating.

*Richard F. Hatfield, P.A.*, by: *Richard F. Hatfield*, for appellant State of Arkansas ex. rel. Attorney General Winston Bryant.

*James F. Lane; Cleta Deatherage Mitchell*, of Term Limits Legal Institute; and *Mackey & Wills, P.A.*, by: *Frank J. Wills III*, for appellant Arkansans for Governmental Reform.

*The McMath Law Firm*, by: *Sandy S. McMath*; and *John T. Harmon & Associates, P.A.*, by: *John T. Harmon*, for appellants Americans for Term Limits and Steve Goss.

*Webb, Doerpinghaus & Brown*, by: *Doyle L. Webb II*; and *Karr, Hutchinson & Stubblefield*, by: *W. Asa Hutchison*, for appellants.

*Williams & Connolly*, by: *John G. Kester, Terrence O'Donnell*, and *Timothy D. Zick*; and *Allen Law Firm*, by: *H. William Allen*, for appellant U.S. Term Limits, Inc. et al.

*Wilson, Engstrom, Corum, Dudley & Coulter*, by: *Stephen Engstrom*, for appellant Unified Members of Legislature.

*Wright, Lindsey & Jennings*, by: *Nancy Bellhouse May, Karen J. Garnett*, and *Judy M. Robinson*, for appellant George O. Jernigan, Jr., and the Democratic Party of Arkansas.

*Friday, Eldredge & Clark*, by: *Elizabeth J. Robben, Robert S. Shafer*, and *Jeffrey H. Moore*, for appellees Bobbie E. Hill and

Dick Herget.

*Mitchell, Williams, Selig, Gates & Woodyard, A Professional Limited Co.,* by: *Sherry P. Bartley,* for appellee Ray Thornton.

ROBERT L. BROWN, Justice. This case concerns the validity of Amendment 73 to the Arkansas Constitution, which establishes limitations on the number of terms that can be served by state constitutional officers, and state legislators, and limitations on the eligibility of candidates for the U.S. Senate and U.S. House of Representatives to have their names placed on the election ballot. Amendment 73 was proposed as an initiated petition by the people of the State under Amendment 7 of the Arkansas Constitution and approved in the General Election on November 3, 1992, by a vote of 494,326 to 330,836.

The proposal, as it appeared on the ballot and was voted on at the General Election, read as follows:

## PROPOSED CONSTITUTIONAL AMENDMENT NO. 4

(Proposed by Petition of the People)

(Popular Name)

## ARKANSAS TERM LIMITATION AMENDMENT

(Ballot Title)

An Amendment to the Constitution of the State of Arkansas limiting the number of terms that may be served by the elected officials of the Executive Department of this state to two (2) four-year terms, this department to consist of a Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, Commissioner of State Lands; limiting the number of terms that may be served by members of the Arkansas House of Representatives to three (3) two-year terms, these members to be chosen every second year; limiting the number of terms that may be served by members of the Arkansas Senate to two (2) four-year terms, these members to be chosen every four years; providing that any person having been elected to three (3) or more terms as a member of the United States House of Representatives from Arkansas

shall not be eligible to appear on the ballot for election to the United States House of Representatives from Arkansas; providing that any person having been elected to two (2) or more terms as a member for the United States Senate from Arkansas shall not be eligible to appear on the ballot for election to the United States Senate from Arkansas; providing for an effective date of January 1, 1993; and making the provisions applicable to all persons thereafter seeking election to the specified offices.

FOR Proposed Constitutional Amendment No. 4 ☐

AGAINST Proposed Constitutional Amendment No. 4 ☐

The text and description of the full Amendment which were published and included in the initiative petition but not on the ballot read:

SUMMARY:

This amendment provides a limit of two (2) terms for the Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General and Commissioner of State Lands. It provides a limit of three (3) terms for State Representatives, and a limit of two (2) terms for State Senators. It also provides that persons having been elected three (3) or more terms as a member of the United States House of Representatives from Arkansas shall not be eligible to appear on the ballot for election to the United States House of Representatives from Arkansas. Lastly, it provides that any person having been elected to two (2) or more terms as a member of the United States Senate from Arkansas shall not be eligible to appear on the ballot for election to the United States Senate from Arkansas.

PREAMBLE:

The people of Arkansas find and declare that elected officials who remain in office too long become preoccupied with reelection and ignore their duties as representatives of the people. Entrenched incumbency has reduced voter participation and has led to an electoral system that is less free, less competitive, and less representative than the sys-

tem established by the Founding Fathers. Therefore, the people of Arkansas, exercising their reserved powers, herein limit the terms of the elected officials.

SECTION 1 — Executive Branch

(a) The Executive Department of the State shall consist of a Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, all of whom shall keep their offices at the seat of government, and hold their offices for the term of four years, and until their successors are elected and qualified.

(b) No elected officials of the Executive Department of this State may serve in the same office more than two such four-year terms.

SECTION 2 — Legislative Branch

(a) The Arkansas House of Representatives shall consist of members to be chosen every second year by the qualified electors of the several counties. No member of the Arkansas House of Representatives may serve more than three such two year terms.

(b) The Arkansas Senate shall consist of members to be chosen every four years by the qualified electors of the several districts. No member of the Arkansas Senate may serve more than two such four-year terms.

SECTION 3 — Congressional Delegation

(a) Any person having been elected to three or more terms as a member of the United States House of Representatives from Arkansas shall not be certified as a candidate and shall not be eligible to have his/her name placed on the ballot for election to the United States House of Representatives from Arkansas.

(b) Any person having been elected to two or more terms as a member of the United States Senate from Arkansas shall not be certified as a candidate and shall not be eligible to have his/her name placed on the ballot for election to the United States Senate from Arkansas.

SECTION 4 — Severability

The provisions of this Amendment are severable, and if any should be held invalid, the remainder shall stand.

SECTION 5 — Provisions Self-Executing

Provisions of the Amendment shall be self-executing.

SECTION 6 — Application

(a) This Amendment to the Arkansas Constitution shall take effect and be in operation on January 1, 1993, and its provisions shall be applicable to all persons thereafter seeking election to the offices specified in this Amendment.

(b) All laws and constitutional provisions which conflict with this Amendment are hereby repealed to the extent that they conflict with this amendment.

The text of the entire Amendment was published prior to the election as required by law. Ark. Const. amend. 7. "Initiative;" Ark. Code Ann. § 7-9-113 (1987).

On November 13, 1992, appellees Bobbie Hill on behalf of herself and the League of Women Voters of Arkansas filed a complaint for declaratory judgment in Pulaski County Circuit Court seeking to invalidate Amendment 73 on several grounds: (1) the Amendment violates Article 1 of the U.S. Constitution by adding an additional qualification for election to the U.S. House of Representatives and the U.S. Senate; (2) the sections of the Amendment are inherently nonseverable and the unconstitutionality of section 3 voids the entire Amendment; (3) the Amendment did not contain an Enacting Clause in violation of Amendment 7 of the Arkansas Constitution.

The original defendants named in the complaint were incumbent State constitutional officers and legislators, U.S. senators and representatives currently in office, the State Democratic Party, the State Republican Party, and the State Board of Election Commissioners. Many of the incumbent State legislators combined their efforts in this matter under the title of Unified Members. Thereafter, other parties intervened. The State of Arkansas through the State Attorney General's office intervened as a party defen-

dant and was joined by various organizations that were proponents of the Amendment: U.S. Term Limits, Inc., Arkansans for Governmental Reform, and Americans for Term Limits, as well as their representatives. An Amended Complaint was subsequently filed adding Dick Herget, a political supporter of U.S. Congressman Ray Thornton, who has previously served three terms in the U.S. House of Representatives, as a party plaintiff. Plaintiff/appellee Bobbie Hill was described as a political supporter of State Representative John Dawson, who has previously served seven terms in the State House of Representatives.

Appellees Hill and Herget joined by U.S. Congressman Ray Thornton and the State Democratic Party moved for summary judgment to void Amendment 73 in accordance with the Amended Complaint. The Unified Members filed a similar motion. The State of Arkansas and Arkansans for Governmental Reform moved to Dismiss the complaint for lack of justiciability. Intervenor U.S. Term Limits moved for summary judgment on grounds that Amendment 73 was valid in all respects.

A hearing ensued on July 29, 1993, and the circuit court handed down its Conclusions of Law that same date which are summarized:

1. The matter is justiciable based on the adverse impact of Amendment 73 on incumbent officeholders and on appellees Hill's and Herget's right to participate in the political process.

2. The omission of an Enacting Clause in the Amendment was a fundamental error and fatal defect in the Amendment.

3. Amendment 73 is a restriction on the qualifications of persons seeking federal congressional offices and violates the U.S. Constitution.

4. The power to limit the terms of State legislative and executive officers vests with the people through a properly drafted initiative.

5. The provisions applying term limits to State officeholders were severable and not inextricably linked to term limits on the federal delegation.

A document entitled Findings of Fact, Conclusions of Law,

and a Final Order which embraced the Conclusions of Law of July 29, 1993, was entered on September 8, 1993. The principal finding of fact on September 8, 1993, was that Amendment 73 contained no Enacting Clause. For that reason the court reiterated its conclusion that the Amendment failed to pass muster under the Arkansas Constitution and declared it void. In the Final Order, the court also ruled that Section 3 pertaining to U.S. senators and representatives violated the Qualifications clauses of the U.S. Constitution, but that Section 3 was severable from Sections 1 and 2 which deal with state elected officeholders.

## I. JUSTICIABILITY

Several appellants including U.S. Term Limits, Inc., Arkansans for Governmental Reform, the State of Arkansas, and Americans for Term Limits contend on appeal that this matter is not justiciable because appellees Hill and Herget and the affected state and federal officeholders have not been adversely impacted by Amendment 73 and, hence, the case is not ripe for decision. Appellants' justiciability argument hinges on the fact that no elections have yet been held where state or federal candidates have been excluded, and no rights to association and speech in appellees Hill and Herget at this juncture have been impaired. They urge that Amendment 73 is prospective and, accordingly, only terms of service after January 1, 1993, will be counted for eligibility purposes. They maintain, in short, that if past terms of service are counted, this would be giving retroactive effect to Amendment 73.

Our law is clear that declaratory relief will lie where (1) there is a justiciable controversy; (2) it exists between parties with adverse interests; (3) those seeking relief have a legal interest in the controversy; and (4) the issues involved are ripe for decision. *UHS of Ark., Inc.* v. *City of Sherwood*, 296 Ark. 97, 752 S.W.2d 36 (1988); *Cummings* v. *City of Fayetteville*, 294 Ark. 151, 741 S.W.2d 638 (1987); *Andres* v. *First Ark. Development Finance Corp.*, 230 Ark. 594, 324 S.W.2d 97 (1959).

We have no problem concluding that appellees Hill and Herget have standing to mount this action for declaratory relief and that the case is ripe for determination. Surely, the ability of Hill and Herget to participate in the political process on behalf of

certain candidates and as voters for those same candidates is in jeopardy which brings into play impairment of speech and association rights under the First and Fourteenth Amendments. *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983); *Thorsted* v. *Gregoire*, C93-770WD (W.D.D.C. Wash. Feb. 10, 1994). The same holds true for the League of Women Voters of Arkansas, which has standing to participate on behalf of its voter-members. *Thorsted* v. *Gregoire, supra.* For the officeholders themselves, both state and federal, the uncertainty over what the future holds is even more daunting. Some officeholders do not know whether they will be foreclosed from seeking election as early as this election year.

■ A case and controversy rages among the various parties to this action, including numerous elected officials, over the effectiveness of Amendment 73 and its application. It is a matter of significant public interest, involving issues of constitutional law. *See Bryant* v. *English*, 311 Ark. 187, 842 S.W.2d 21 (1992). Because of the far-reaching impact of the issue and the potential for an imminent impairment of the legitimate interests of elected officeholders and their supporters occasioned by the Amendment, the matter is ripe for adjudication and justiciable.

## II. ENACTING CLAUSE

We turn next to the facet of this case on which the circuit court predicated its decision — the absence of an Enacting Clause in Amendment 73. Amendment 7 to the Arkansas Constitution sets the following requirement:

> Enacting Clause — The style of all the bills initiated and submitted under the provisions of this section shall be, "Be It Enacted by the People of the State of Arkansas" (municipality, or county as the case may be). In submitting measures to the people, the Secretary of State and all other officials shall be guided by the general election laws or municipal laws, as the case may be, until additional legislation is provided therefor.

The circuit court found that the omission of the Enacting Clause was fatal to Amendment 73 and voided it on that basis.

The appellants vehemently attack this ruling on several grounds: (1) appellees Hill and Herget waged, in essence, a con-

test over the sufficiency of the initiated petition with their Enacting Clause argument, and the circuit court had no jurisdiction over sufficiency matters; (2) Amendment 7 speaks of the style of all "bills" needing Enacting Clauses, and "bills" is a legislative term which does not include constitutional amendments; (3) the requirements of Amendment 7 are directory post-election and not mandatory; and (4) there was substantial compliance with the requirements of Amendment 7.

■ We believe that the declaratory judgment action which raised the Enacting Clause issue and the validity of Amendment 73, post-election, was appropriately before the circuit court and that that court had jurisdiction to hear the matter. We, therefore, turn to the language of Amendment 7 itself.

Under the title "Initiative," Amendment 7 reads:

> The first power reserved by the people is the initiative. Eight percent of the legal voters may propose *any law* and ten percent may propose a *Constitutional Amendment* by initiative petition, and every such petition shall include the full text of the measure so proposed. (Emphasis ours.)

The people of this State may propose either laws or constitutional amendments by initiative petition. The lawmaking power given to the people to propose and adopt laws by initiative petition was intended to supplement existing legislative authority in the General Assembly. *See Ferrell* v. *Keel*, 105 Ark. 380, 151 S.W. 269 (1912). That power, though, is not what is involved in the case before us. Here, we are concerned with an initiative petition to amend the Arkansas Constitution, which is a separate matter altogether.

■ In common legal parlance, a "bill" is a draft of an act of the legislature before it becomes law. *Black's Law Dictionary* 167 (6th ed. 1991). Under Amendment 7, the people of this State have the power to enact "bills" into laws by direct vote. The term "bills" as used in the Enacting Clause section of Amendment 7 does not refer to statewide constitutional amendments but only to initiated proposals where the people are seeking to enact their own laws. Our case law recognizes that Amendment 7 requires an Enacting Clause for initiated *bills* by the people. *Hailey* v. *Carter*, 221 Ark. 20, 251 S.W.2d 826 (1952). That is

because the people, as opposed to the General Assembly, are enacting the laws under their initiative power. But, again, the same does not hold true for constitutional amendments. We are aware of no case in Arkansas holding that an Enacting Clause is required for a proposed statewide constitutional amendment.

The circuit court failed to make this distinction, but the Enacting Clause provision makes it clear by referring to bills. In the case before us, Amendment 73 was published as required by law and adopted by a wide majority of those voting on the issue. The ballot title stated that it was "Proposed by Petition of the People." It was abundantly clear that this was a proposed amendment to the Arkansas Constitution to put term limits into effect.

In sum, Amendment 7 makes no requirement for an enacting clause for statewide initiated petitions to amend the Arkansas Constitution, and we so hold. We reverse the circuit court on this point.

### III. QUALIFICATIONS CLAUSE

We next address the issue of whether the State of Arkansas can render certain incumbent U.S. senators and representatives ineligible to appear on the ballot for their respective positions. We conclude that such a restriction on eligibility to stand for election to the U.S. Congress is violative of the respective Qualification clauses of Article 1 of the U.S. Constitution. Those clauses read:

§ 2. House of representatives.

. . . .

No person shall be a representative who shall not have attained to the age of twenty-five years, and been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of that state in which he shall be chosen.

. . . .

§ 3. Senate.

. . . .

No person shall be a senator who shall not have

attained to the age of thirty years, and been nine years a citizen of the United States, and who shall not, when elected, be an inhabitant of the state for which he shall be chosen.

U.S. Const. art 1, § 2, cl. 2 and § 3, cl. 3.

The parties in this case have taken considerable pains to educate this court on the history of the respective Qualification clauses and the original intent of the framers of the U.S. Constitution. We find the history to be helpful but inconclusive regarding the issue at hand. We can glean from the history that a provision to require the rotation, as it was called, of senators and representatives was discussed and debated and ultimately discarded at the Constitutional Convention as a formal provision of the U.S. Constitution. C. Warren, *The Making of the Constitution* (1928). No doubt that evinces a decision on the part of the framers not to mandate rotation, or term limits. At the same time, whether the states are foreclosed from adding a restriction to candidacy in the form of service limitations is not specifically addressed. Under the previous Articles of Confederation, individual states had this authority, and delegates to Congress were limited to a term of three years. Art. Conf. V (1777). The framers of the U.S. Constitution did not expressly endow the states with this same authority. Indeed, the Constitutional Convention of 1787 defeated a proposal for the states to set property qualifications for service in Congress. C. Warren, *The Making of the Constitution* 418 (1928).

The ultimate document proposed by the framers and ratified by the states as the U.S. Constitution enumerated three benchmarks for congressional service — age, citizenship, and residency. No other qualifications were included. When the House of Representatives attempted to add one more by refusing to seat one of its own members in 1967, Rep. Adam Clayton Powell, for wrongfully diverting federal funds to himself, his wife, and staff, the United States Supreme Court scuttled the effort. *Powell* v. *McCormack*, 395 U.S. 486 (1969). In doing so, the Court quoted Alexander Hamilton, who was answering an antifederalist charge during the ratification process that the proposed U.S. Constitution favored the wealthy and propertied interests:

The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications

of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the *times*, the *places*, the *manner* of elections. *The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature.* The Federalist Papers 371 (Mentor ed 1961). Emphasis in last sentence added.)

395 U.S. at 539.

The Legislature referenced by Hamilton was the Congress, but it is his allusion to the fixed and immutable character of the enumerated qualifications that is illuminating today. In that same decision, *Powell* v. *McCormack*, the Court made mention of a Report by the House Committee on Elections regarding the eligibility of William McCreery to sit in Congress. The issue concerned an additional residency requirement imposed by the State of Maryland that disqualified him. That Report clearly and specifically determined that the U.S. Constitution reserved no authority in the State legislatures to change, add to, or diminish the qualifications set forth in Article 1. 395 U.S. at 542-543, *citing* 17 *Annals of Cong.* 871-872 (1807).

Qualifications set out in the U.S. Constitution, unalterable except by amendment to that document, is a conclusion that makes eminently good sense. If there is one watchword for representation of the various states in Congress, it is uniformity. Federal legislators speak to national issues that affect the citizens of every state. Additional age restrictions, residency requirements, or sundry experience criteria established by the states would cause variances in this uniformity and lead to an imbalance among the states with respect to who can sit in Congress. This is precisely what we believe the drafters of the U.S. Constitution intended to avoid. The uniformity in qualifications mandated in Article 1 provides the tenor and the fabric for representation in the Congress. Piecemeal restrictions by state would fly in the face of that order.

The appellants raise a corollary argument. They urge that Amendment 73 is merely a ballot access amendment and not a mandate establishing an additional qualification. No doubt some

effort was made by the drafters of Amendment 73 to couch it in terms of eligibility "to appear on the ballot" rather than as a disqualification. And organizing and overseeing the time, place, and manner of elections clearly falls within the province of the states under the U.S. Constitution. U.S. Const. art 1, § 4. Provisions, for example, requiring state officials to resign before running for federal office have been upheld as merely falling within the general power of the states to regulate federal elections. *See, e.g., Joyner* v. *Mofford*, 706 F.2d 1523 (9th Cir.), *cert. denied,* 464 U.S. 1002 (1983).

■ This effort to dress eligibility to stand for Congress in ballot access clothing, that is, as a regulatory measure falling within the State's ambit under Article 1, § 4, is not without some rational appeal. We do not agree, however, that excluding a broad category of persons from seeking election to Congress is a mere exercise of regulatory power. The intent and the effect of Amendment 73 are to disqualify congressional incumbents from further service. We do recognize that an ineligible congressman under Amendment 73 is not totally disqualified and might run as a write-in candidate for Congress or receive a gubernatorial appointment to fill a vacancy in the same body. Following this thread, the appellants posit that term limitations do not mean disqualification — only ineligibility to be placed on the ballot as a candidate for certain offices. These glimmers of opportunity for those disqualified, though, are faint indeed — so faint in our judgment that they cannot salvage Amendment 73 from constitutional attack. *See Thorsted* v. *Gregoire*, C93-770WD (W.D.D.C. Wash. Feb. 10, 1994).

■ An additional qualification has been added to congressional eligibility. The list now reads age, nationality, residency, and prior service. Term limitations for congressional representation may well have come of age. But to institute such a change, an amendment to the U.S. Constitution is required, ratified by three-fourths of the states. U.S. Const. art 5. In sum, the Qualification clauses fix the sole requirements for congressional service. This is not a power left to the states under the Tenth Amendment. The attempt to add an additional criterion based on length of service is in direct conflict with the Qualification clauses, and the Supremacy Clause pertains. Section 3 is stricken from Amendment 73.

## IV. SEVERABILITY

Because we strike down Section 3 of Amendment 73, we must now address the issue of whether this jeopardizes the entire Amendment. The argument is made by the Unified Members that it does because the provisions relating to federal legislators and to state officeholders and legislators are inextricably linked irrespective of the presence of a severability clause in the Amendment. The Unified Members further stress that Amendment 73 was packaged as one plan.

Section 4 of the Amendment reads: "The provisions of this Amendment are severable, and if any should be held invalid, the remainder shall stand." The circuit court ruled on this issue twice. In its first opinion dated July 29, 1993, this conclusion was reached:

> Section 3, of the term limit amendment which is the constitutionally invalid provision is linked to state term limits on (sic) only in theme, a theme that the voters overwhelmingly approved by initiative. To hold that the provisions are "inextricably linked" per the analysis in *Hasha*[1] this Court would have to conclude that the voters dislike for the federal delegation was overwhelming to the extent that they forced term limits upon state officials, an analysis that this Court cannot make.

Later, in its Final Order of September 8, 1993, the court ruled:

> 5. Sections 1 and 2 of Amendment 73 are not invalid because they were combined with unconstitutional limits on United States Senators and Representatives.
>
> 6. The court cannot conclude that the voter's dislike for incumbent United States Senators and Representatives was overwhelming to the extent that it caused voters to impose state limits on officers, senators and representatives.
>
> 7. Sections 1 and 2 of Amendment 73 are severable from Section 3 pursuant to the severability clause in Section 6 thereof.

---

[1] *Hasha* v. *City of Fayetteville*, 311 Ark. 460, 845 S.W.2d 500 (1993).

■ Our cases over the years have been consistent in examining the severability issue. In determining whether the invalidity of part of the act is fatal to the entire legislation, we have looked to 1) whether a single purpose is meant to be accomplished by the act; and 2) whether the sections of the act are interrelated and dependent upon each other. *Borchert* v. *Scott*, 248 Ark. 1050-H, 460 S.W.2d 28 (1970) (supplemental opinion on rehearing); *Faubus* v. *Kinney*, 239 Ark. 443, 389 S.W.2d 887 (1965); *Nixon* v. *Allen*, 150 Ark. 244, 234 S.W. 45 (1921); *Cotham* v. *Coffman*, 111 Ark. 108, 163 S.W. 1183 (1914). In *Faubus* v. *Kinney*, we noted that it is important whether the portion of the act remaining is complete in itself and capable of being executed wholly independent of that which was rejected. Clearly, when portions of an act are mutually connected and interwoven, severance is not appropriate. *Wenderoth* v. *City of Ft. Smith*, 251 Ark. 342, 472 S.W.2d 74 (1971).

The presence of a severability clause is a factor to be considered but, by itself, it may not be determinative. In *Combs* v. *Glen Falls Insur. Co.*, 237 Ark. 745, 375 S.W.2d 809 (1964), we stated that a severability clause may be an aid to the courts in construction of a statute but in the words of Justice Brandeis, it is not "an inexorable command." 237 Ark. at 748, 375 S.W.2d at 810, *citing Dorchy* v. *Kansas*, 264 U.S. 286 (1924). In *Combs*, we concluded that the clause could not salvage the act of the General Assembly in question, and we voided the entire act.

Recent authority indicates that other jurisdictions subscribe to the same basic principles for determining severability as we in Arkansas. *See Board of Natural Resources* v. *Brown*, 992 F.2d 937 (9th Cir. 1993); *Gerken* v. *Fair Political Practices Comm'n*, 863 P.2d 694 (Cal. 1993); *Legislature of the State of California* v. *Eu*, 816 P.2d 1309 (Cal. 1991), *cert. denied*, 112 S.Ct. 1292 (1992). In *Brown*, the Ninth Circuit focused on whether the unconstitutional portion of the act was functionally independent and, secondly, on whether the Congress would have enacted the law without the unconstitutional provision. In *Legislature of the State of California* v. *Eu*, the California Supreme Court proposed a test with three facets for severability — whether the invalid portion of the measure was grammatically, functionally, and volitionally separable from the remainder. By volitionally separable, the court meant whether the people would have voted for it inde-

pendent of the invalid provisions. The court in *Eu* considered the severability of a void provision in a constitutional amendment establishing term limits. It declared the clause in the amendment relating to restrictions on pensions for incumbent legislators to be unconstitutional but held it to be severable and upheld the balance of the amendment fixing term limits.

A reading of Sections 1, 2, and 3 of Amendment 73 shows that they are grammatically independent and functionally independent. The question then remains whether the Arkansas voters would have adopted Sections 1 and 2 relating to State officeholders and legislators in the absence of Section 3 which applies to U.S. senators and representatives. We believe that the circuit court was correct in concluding that what the people voted for in adopting Amendment 73 was a theme or concept — the limitation of service terms for persons in public office. The fact that one category of persons is eliminated from that adopted Amendment does not mean that the voters did not intend it to apply to the remaining two categories. Nor do we consider term limits on federal legislators to be the bait which enticed voters to vote aye on the amendment as a whole. There is nothing to suggest that this was the case. In short, we are confident that Amendment 73 would have passed even without the inclusion of Section 3 in that the majority was voting for a concept — the limitation of public service terms.

We further disagree that *Hasha* v. *City of Fayetteville, supra*, controls this case. In *Hasha*, the issue was the placement of an invalid proposal for $10 million in public school bonds on the same ballot with a proposal for a 20-year one percent sales and use tax to secure capital improvement bonds, including the school bonds. We held that the two proposals were inextricably linked, and we stated:

> A voter who wished to vote for the issuance of the $10,000,000 in bonds for the school district knew that he or she was required to also vote in favor of the tax because, without the tax, the bonds could not be issued. It is abundantly clear that the proposal for the issuance of the bonds for the construction of the school facilities was popular with the voters.

311 Ark. at 469, 845 S.W.2d at 505.

That is not the situation with Amendment 73. The common theme of term limitations applies equally to all three categories of elected officeholders. In *Hasha*, the public school bonds were categorically different from the sales and use tax and from the other capital improvement bonds. The school bonds provided an obvious lure to assure a favorable vote on the tax proposal. Here, there is nothing before us to indicate that the voting public sought to limit one category of elected official moreso than another.

The remaining sections of Amendment 73 can stand independently without the presence of Section 3. There is nothing to suggest that the voters intended Sections 1, 2, and 3 to be dependent on one another so that if one section failed, the other sections failed also. The balance of Amendment 73 is valid.

### V. STATE OFFICEHOLDERS

We next examine the constitutionality of Sections 1 and 2 of Amendment 73 relating to term limits on State executive and legislative officeholders. The circuit court, though it invalidated the entire amendment for lack of an Enacting Clause, ruled that Sections 1 and 2 do not violate the First and Fourteenth Amendments to the U.S. Constitution.

We concur with this ruling. Individual states have limited the terms of their officeholders for decades, albeit more in the context of their governors than their legislators. *See Miyazawa* v. *City of Cincinnati*, 825 F.Supp. 816, 821 (S.D. Ohio 1993). In the case before us, the policy and interest of the State of Arkansas was expressed in the Preamble to Amendment 73:

> The people of Arkansas find and declare that elected officials who remain in office too long become preoccupied with reelection and ignore their duties as representatives of the people. Entrenched incumbency has reduced voter participation and has led to an electoral system that is less free, less competitive, and less representative than the system established by the Founding Fathers. Therefore, the people of Arkansas, exercising their reserved powers, herein limit the terms of elected officials.

In counterpoint to the State's interest, as expressed by the adoption

of Amendment 73, are the interests of current State officeholders and their supporters such as appellee Hill. We have already referred in this opinion to those legitimate interests in the political process which are protected under the First and Fourteenth Amendments.

The United States Supreme Court has made it clear that the right to candidacy is not a fundamental right requiring close scrutiny. *Bullock* v. *Carter*, 405 U.S. 134 (1972); *see also Clements* v. *Fashing*, 457 U.S. 957 (1982) (plurality decision). A second question, though, is whether the right of a person such as appellee Hill to participate in a person's political campaign or to vote for a candidate is fundamental in nature so as to warrant a *compelling* state interest to offset it. Separating the rights of the candidate from those of the supporter may be difficult. The Court observed in 1992 that "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Burdick* v. *Takushi*, 112 S.Ct. 2059, 2065-2066 (1992), *quoting Bullock* v. *Carter*, 405 U.S. 134, 143 (1972).

In *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983), the Court weighed the speech and association interests of voters for and supporters of John Anderson, an independent candidate for president of the United States, against the State of Ohio's asserted interest in protecting political stability by setting an early filing deadline. The Court held that the supporters' interests unquestionably outweighed the State's regulatory interests. The proper standard for resolving the assessment of the State's interest and the burden on supporters has since been described "as a more flexible standard" dependent on the severity of the burden. *Burdick* v. *Takushi*, 112 S.Ct. 2059, 2063 (1992). However, not every burden on the right to vote is subject to strict scrutiny or requires a compelling state interest to justify it. *Id.*

The California Supreme Court, in the wake of the *Anderson* case, considered the effect of a constitutional amendment fixing term limits on elected state officials. *Legislature of the State of California* v. *Eu*, 816 P.2d 1309 (Cal. 1991), *cert. denied*, 112 S.Ct. 1292 (1992). That Court weighed the interests of the voters and supporters of certain candidates against the will of the electorate limiting incumbent terms and held that the amendment would prevail irrespective of whether a rational basis standard or a compelling state interest standard was employed. The Court stated:

In sum, it would be anomalous to hold that a statewide initiative measure aimed at "restor[ing] a free and democratic system of fair elections," and "encourag[ing] qualified candidates to seek public office" (Cal. Const., art. IV, § 1.5), is invalid as an unwarranted infringement of the rights to vote and to seek public office. We conclude the legitimate and compelling interests set forth in the measure outweigh the narrower interests of petitioner legislators and the constituents who wish to perpetuate their incumbency.

816 P.2d at 1329.

■■ It is not the function of this court to agree or disagree with the purpose and rationale behind Amendment 73. It is our function to determine whether the Amendment expresses such a legitimate and sufficient state interest that the rights of the supporters and the incumbents must yield. We hold that the state interest, as expressed in the Preamble to Amendment 73, is sufficiently rational and even compelling when weighed against the residual burden placed on the rights and privileges of elected officeholders and those desiring to support them.

## VI. TERMS OF SERVICE COUNTED

Because we hold that Sections 1 and 2 of Amendment 73 are severable and valid, we must determine when the terms of service by State officeholders are counted for purposes of disqualification. Appellant Americans for Term Limits as well as appellees Hill and Herget contend as part of their justiciability arguments that Amendment 73 is retroactive in its effect and that terms of service prior to the Amendment's effective date of January 1, 1993, should be counted for disqualification purposes. Other appellants, including the State of Arkansas and U.S. Term Limits, Inc., argue that only terms of service after the effective date of the Amendment are to be counted. The effect of counting terms of service after January 1, 1993, would be that State executive officers and senators would not be ineligible for another eight years (two four-year terms) and that State representatives would not be ineligible for another six years (three two-year terms). Conversely, by counting prior terms of service, any State executive officer or senator having previously served two terms and any State representative having previously served three terms is disqualified.

In reviewing several of the term limitations amendments adopted in other states, we note where the amendments either provide a date certain from which terms will be counted or, alternatively, provide for ineligibility based on a fixed number of years served:

- State of Washington. Wash. Rev. Code § 29.15.240 (Supp. 1993) (no terms served before November 3, 1992, may be used to determine eligibility to appear on the ballot) (approved Nov. 3, 1992).

- State of California. Cal. Const. art. XX, § 7 (applies to terms of state constitutional officers and legislators where the official was elected or appointed to the office after November 6, 1990) (adopted Nov. 6, 1990).

- State of California. Cal. Elections Code § 25003 (Deering Supp. 1993) (terms of office in Congress prior to January 1, 1993, shall not be counted) (approved Nov. 3, 1992).

- State of Colorado. Colo. Const. art. XVIII, § 9a (applies to terms of office in Congress beginning on or after January 1, 1991) (approved Nov. 6, 1992).

- State of Wyoming. Wyo. Stat. §§ 22-5-103, 22-5-104 (1992) (terms of service in state offices and in Congress prior to January 1, 1993, shall not be counted) (approved Nov. 3, 1992).

- State of Florida. Fla. Const. art. 6, § 4 (no person may appear on ballot for state or federal office if by end of current term in office, the person will have served in that same office for eight consecutive years) (approved Nov. 3, 1992).

- State of North Dakota. N.D. Cent. Code § 16.1-01-13.1 (Supp. 1993) (person ineligible for Congress if by the start of the term for which election is being held that person has served at least twelve years) (approved Nov. 3, 1992).

- State of Oklahoma. Okla. Const. art 5, § 17A (member of Legislature elected after effective date of amendment eligible to serve 12 additional years) (approved Sept. 18, 1990).

- State of Ohio. Ohio Const. art. V, § 8 (terms beginning on or after January 1, 1993, shall be considered for eligibility to the U.S. Senate and House of Representatives) (approved Nov. 3, 1992).

Amendment 73 does not expressly provide a separate benchmark date after which terms of service will be counted.

██ To resolve the question of when to count terms, we turn to the measure itself. In doing so, we construe constitutional amendments liberally to accomplish their purposes. *Porter* v. *McCuen*, 310 Ark. 674, 839 S.W.2d 521 (1992). We will not give a strained construction contrary to the spirit and purpose of the amendment as expressed by the people. *Thompson* v. *Younts*, 282 Ark. 524, 669 S.W.2d 471 (1984). Amendment 73 contains an effective date and states that none of the State elected officials, whether executive or legislative, may serve more than the specified number of terms. It further proclaims that it is "applicable to all persons thereafter seeking election." However, it is simply not clear on when counting the terms must commence.

 ██ Constitutional amendments operate prospectively unless the language used or the purpose of the provision indicates otherwise. *Drennan* v. *Bennett*, 230 Ark. 330, 322 S.W.2d 585 (1959). We have also held that with respect to an amendatory act the legislation will not be construed as retroactive when it may be reasonably construed otherwise. *Lucas* v. *Handcock*, 266 Ark. 142, 583 S.W.2d 491 (1979); *see also Gannett River States Publishing Co.* v. *Arkansas Indus. Dev. Comm'n*, 303 Ark. 684, 799 S.W.2d 543 (1990). The same rule of construction is equally applicable to a constitutional amendment. The Amendment in this case is vague and ambiguous on the point of when to begin counting terms. As already stated, two proponents of the Amendment, U.S. Term Limits, Inc. and the State of Arkansas represented by the Attorney General's office, interpret it to apply prospectively. Arkansans for Governmental Reform took the same position before the circuit court. Because of the vagueness in the Amendment on this point, we agree. Only periods of service commencing on or after January 1, 1993, will be counted as a term for limitation purposes under Amendment 73.

A mandate will issue in this case on March 14, 1994. Any petition for rehearing shall be filed no later than March 9, 1994.

Any response shall be filed no later than March 11, 1994.

Special Justices ERNIE WRIGHT and CARL MCSPADDEN join in this opinion.

DUDLEY and HAYS, JJ., and Special Chief Justice GEORGE K. CRACRAFT and Special Justice GERALD P. BROWN concur in part and dissent in part.

HOLT, C.J., and NEWBERN, GLAZE and CORBIN, JJ., not participating.

ROBERT H. DUDLEY, Justice, concurring in part, dissenting in part. I concur in three of the holdings of the majority opinion, dissent from one, and do not reach the other two.

## I.

I concur with the holding that this case presents a justiciable issue. The petitioners below sought a judgment declaring that Amendment 73 is invalid. We have said that a declaratory judgment is especially appropriate in disputes between private citizens and public officials about the meaning of the constitution or statutes. *Culp* v. *Scurlock*, 225 Ark. 749, 284 S.W.2d 851 (1955). If, as argued by intervenors, some state officeholders are illegally holding office, their salaries would constitute illegal exactions, and a declaratory judgment action is appropriate to determine that issue. *McDonald* v. *Bowen*, 250 Ark. 1049, 468 S.W.2d 765 (1971). Thus, there is a justiciable issue, and a suit for declaratory judgment is the proper action to determine the issue.

## II.

I concur with the holding that Amendment 73, in part, violates the Constitution of the United States. It does so for three reasons. First, the framers rejected the idea of term limits in drafting the Constitution. Second, allowing a several state to create qualifications for national officeholders is antithetical to republican values. Third, the imposition of term limitations upon members of the Congress of the United States would violate the Qualifications Clause of the Constitution because it would add a qualification — lack of incumbency — to the requirements that are fixed by the Constitution, and the several states do not have this power. *See Plugge* v. *McCuen*,

310 Ark. 654, 661, 841 S.W.2d 139, 143 (1992) (Dudley, J., dissenting).

The third reason stated above is a close question and difficult issue. The articulate dissenting opinions of Justices Hays and Cracraft cause one to pause. The argument that a candidate is only barred from appearing on the ballot, but is not barred as a write-in candidate, is appealing at first blush, but when one thinks about it the issue becomes clear because, as a practical matter, the amendment would place term limits on service in the Congress. I am reassured by the style of this case, U.S. Term Limits, Inc. That name implies just what this amendment is: A practical limit on the terms of the members of the Congress. The fact that a person can conceivably be elected as a write-in candidate does not vitiate the fact that, as a practical matter, write-in candidates are at a distinct disadvantage. The result would be that the Qualifications Clause would be violated by the amendment.

### III.

I concur in the holding that the voters of this State can, by amendment of the state constitution, limit the terms of state officeholders. There is no violation of the First and Fourteenth Amendments to the Constitution of the United States because the state interest of limiting the terms of officeholders clearly outweighs the burden on the officeholders and those supporting them. *See Anderson* v. *Celebrezze*, 460 U.S. 780 (1983).

### IV.

I dissent from the holding in the plurality opinion that the provision in the amendment for limiting the terms of federal officeholders can be severed from the provision limiting the terms of state officeholders. This is a state issue and is governed by state law.

Amendment 73 contains a severability clause, but that clause alone does not necessarily determine severability. In *Combs* v. *Glen Falls Insurance Co.*, 237 Ark. 745, 375 S.W.2d 809 (1964), we wrote:

> A severability clause is frequently an aid to the Courts in the construction of a statute, but, in the oft-quoted words

of Justice Brandeis, it is not "an inexorable command." *Dorchy* v. *Kansas*, 264 U.S. 286, 68 L. Ed. 686, 44 S. Ct. 323. *While such a clause deserves reasonable considera-tion it should not be paid undue homage.* Sutherland, Statu-tory Construction (3d Ed.) §2408. For example, if an act should levy a new tax and create a new agency for its col-lection, no one could doubt that the invalidation of the tax would also do away with the collection agency, despite the presence of a severability clause. In *Nixon* v. *Allen*, 150 Ark. 244, 234 S.W. 45, we declared an entire act to be invalid, in the face of such a clause, *because we concluded that if the legislature had known in advance that part of the act was unconstitutional it would not have enacted the rest. That is really the test.*

*Id.* at 747-48, 375 S.W.2d at 810-11 (emphasis added).

After writing the above, we declared the entire act void even though the act at issue contained a severability clause and only part of the act was invalid. We did so because the "alternatives are complementary and interdependent." *Id.* at 748, 375 S.W.2d at 811.

Somewhat like the case at bar, in *Allen* v. *Langston*, 216 Ark. 77, 224 S.W.2d 377 (1949), the citizens of Lee County passed an initiated motor vehicle tax act pursuant to Amendment 7, the initiative amendment. The initiated act authorized a tax on motor vehicles as well as wagons and buggies. A part of the tax was for the privilege of driving motor vehicles on the high-ways, and we held that the county's attempt to tax the use of the highways for motor vehicles was contrary to the general law of the state and therefore unconstitutional. However, that part of the act which taxed wagons and buggies was valid since state law had not pre-empted that field. In sum, part of the initiated act was valid and part of it was invalid. We held the entire ini-tiated act void "for the reason that *it seemed apparent that the people of Lee County had no intention of separating and enforc-ing the provision as to wagons and buggies in the event the remaining tax on motor vehicles was declared void and of no effect." Id.* at 85, 224 S.W.2d at 381 (emphasis added).

Likewise, in *Wenderoth* v. *City of Fort Smith*, 251 Ark. 342,

472 S.W.2d 74 (1971), we said that when parts of a law are connected and interwoven, and the legislature intended to enact the law as a whole and not in parts, severance is not appropriate.

In *Hasha* v. *City of Fayetteville*, 311 Ark. 460, 845 S.W.2d 500 (1993), the city placed a sales and use tax proposal on the same ballot as an invalid proposal to construct school facilities. The invalid proposal to construct school facilities was a lure to obtain a favorable vote on the tax. We held severance was not appropriate because the two proposals were "inextricably linked" and "tied together." We wrote: "There was a natural relationship between them. The two proposals were part of the same plan. They were united." *Id.* at 470, 845 S.W.2d at 505. Also, the bonds were "a primary purpose of the tax." *Id.*, 845 S.W.2d at 506. Both the dissenting opinion and the dissenting opinion on rehearing make clear the fact that no evidence was submitted to support the holding that the voters were lured into voting for the tax. *See* 311 Ark. 460, 471, 845 S.W.2d 500, 506 (Glaze, J., dissenting); *Hasha* v. *City of Fayetteville*, 311 Ark. 476-A, 476-C, 847 S.W.2d 41, 42 (1993) (supplemental opinion denying rehearing) (Glaze, J., dissenting). The pertinent questions are whether there the two proposals were inextricably linked in the minds of the voters, whether they were tied together in the minds of the voters, whether the voters perceived a natural relationship between them, whether they were presented as being united, whether the voters had any intention of separating the proposals and enforcing them separately, and whether both were a primary purpose of the amendment. To state the questions is to answer them. The two proposals were clearly tied together. They were linked. There was a natural relationship between them. Limiting the terms of members of Congress was a primary purpose of the amendment. *Both proposals were sold together as one political package.*

Each ballot cast at the election contained a ballot title, or summary, of the amendment. The great majority of voters derived their information about the amendment from the ballot title. *Dust* v. *Riviere*, 277 Ark. 1, 638 S.W.2d 663 (1982). The ballot title that the voters read in voting on this amendment was as follows:

An Amendment to the Constitution of the State of Arkansas limiting the number of terms that may be served by the elected officials of the Executive Department of this

state to two (2) four year terms, this department to consist of a Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, Commissioner of State Lands; limiting the number of terms that may be served by members of the Arkansas Senate to two (2) four-year terms, these members to be chosen every four years; providing that any person having been elected to three (3) or more terms as a member of the United States House of Representatives from Arkansas shall not be eligible to appear on the ballot for election to the United States House of Representatives from Arkansas; providing that any person having been elected to two (2) or more terms as a member for the United States Senate from Arkansas shall not be eligible to appear on the ballot for election to the United States Senate from Arkansas; providing for an effective date of January 1, 1993; and making the provisions applicable to all persons thereafter seeking election to the specified offices.

Before the vote on the amendment was held, the proponents of the measure were aware of the problems involved in linking the two measures. In declining to remove the proposal from the ballot before the election this court wrote:

Undoubtedly, a strong case can be made concerning the Term Limitation Amendment's invalidity both under Arkansas's and the United States' Constitutions, and *voters should be aware that their votes for or against this measure may ultimately have value only as an expression of public sentiment on the subject. In short, a future judicial proceeding will be required to decide the Amendment's validity if it is adopted by the people.* If that occurs, the constitutional arguments posited here will then be placed squarely before us and can be decided after due and proper consideration.

*Plugge* v. *McCuen*, 310 Ark. 654, 661, 841 S.W.2d 139, 143 (1992) (emphasis added).

Undisputedly, the two proposals were packaged and sold together. One of the proposals is valid, while the other is unconstitutional. The proponents of the amendment were aware of the

pending constitutional issue, but they objected to it being decided before the election. Still, they continued to sell the proposals together. The majority opinion severs the two proposals *after the election* and declares one of them valid.

The precedent set by the majority opinion runs counter to the efforts of this court to require fairness and honesty in the presentation of initiated proposals to the voters. We have required that ballot titles be honest and impartial. *Dust* v. *Riviere*, 277 Ark. 1, 638 S.W.2d 846 (1984); *Shepherd* v. *McDonald*, 189 Ark. 29, 70 S.W.2d 566 (1934). We have mandated that ballot titles fairly assess the general purpose of the act. *Coleman* v. *Sherrill*, 189 Ark. 843, 75 S.W.2d 248 (1934). We have held they must not be misleading. *Westbrook* v. *McDonald*, 184 Ark. 740, 43 S.W.2d 356 (1931).

The troubling aspect of the precedent set by the case at bar is illustrated by the case of *Hoban* v. *Hall*, 229 Ark. 416, 316 S.W.2d 185 (1958). It that case we ordered a proposal removed from the ballot before the people voted on it, and, to that extent it is not applicable, but it is applicable to demonstrate how some people will attempt to bait a proposed amendment. The proponents of the initiated amendment named their proposal "The States' Rights Amendment" since that was a popular concept in the South at the time. However, the ballot title failed to disclose that the amendment would create a commission with overreaching authority. It could conduct investigations and conduct public or secret hearings and "interrogate any citizen in the state about his business affairs, his private life, his political beliefs, or any other subject that can be imagined." *Id.* at 420, 316 S.W.2d at 187. If a public official failed to carry out "the clear mandates" of the amendment, he was subject to a fine, imprisonment, and automatic forfeiture of office. *Id.* In removing the proposal from the ballot because the proponents only disclosed the bait of states' rights, we wrote:

> The cause of states' rights, like that of the aged and the blind, is deservedly a popular one and undeniably appeals to the great body of the electorate. But are there provisions in the amendment which, if made known, would give the voter serious ground for reflection?

*Id.* at 418, 316 S.W.2d at 187. We did not allow the misleading political packaging.

The majority opinion does not fully address political packaging and the questionable precedent. Rather, it misses the mark and concentrates on whether the two proposals can be said to literally stand independently.

In summary, I concur in holding that the part of Amendment 73 which is in violation of the Constitution of the United States is void, and that part which limits the terms of state officeholders is valid. I would hold that in the minds of the voters the invalid part of the amendment was inextricably linked with the valid part, and, as a result, I would not allow the two proposals to be severed after the election. Consequently, I would hold that Amendment 73 is void.

## V.

Since I would hold that Amendment 73 is void for the reasons set out above, I do not reach the issues regarding the enacting clause and terms of service counted.

STEELE HAYS, Justice, concurring in part and dissenting in part. Although I agree with today's decision upholding term limits upon state officeholders and severing that part of Amendment 73, I disagree with the holding of the majority that the eligibility restriction upon United States senators and representatives is unconstitutional. I start from the premise that all political authority resides in the people, limited only by those provisions of the federal or state constitutions specifically to the contrary. In this instance the people of Arkansas have spoken, prudently or otherwise, in the most direct means available to them — an initiated amendment to their state constitution. That expression should not be denied them except on clear and compelling grounds. Such grounds have not been demonstrated to my satisfaction.

The people of each state possess all powers which are not expressly or impliedly delegated to the federal government or which they are not prohibited from exercising by the United States Constitution. U.S. Const. amend. 10. *See State v. Nichols*, 26 Ark. 74 (1870). Further, we must presume the amendment is constitutional, and all doubts must be resolved in favor of its

282

constitutionality if it is possible to do so. *Fayetteville School Dist.* v. *Arkansas State Bd. of Education*, 313 Ark. 1, 825 S.W.2d 122 (1993); *Gazaway* v. *Greene County Equalization Board*, 314 Ark. 569, 864 S.W.2d 233 (1993). Accordingly, if a provision of the amendment is not clearly prohibited, we are obliged to construe it as constitutional.

I find the United States Constitution does not prohibit additional qualifications for senators and representatives. The Qualification Clauses of Article 1 of the Constitution simply provide: "No person shall be a representative [senator] *who shall not have* . . . ." (Emphasis supplied.) This language indicates the qualifications are to be the *minimum* requirements rather than the *exclusive* requirements. I see it as significant that the Constitution provides: "the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." Art. 1, § 2, cl. 1. This provision contemplates allowing a state to require an elector to have attained the age of thirty years.[1] It seems clear the framers intended to prevent a person under the age of twenty-five years from being elected to the House of Representatives, but, if a state required electors to be at least thirty years of age, it is implausible to conclude the state would be required to allow a person to run for office who could not vote. Since the framers determined that the people of each state could establish requirements for their electors, it stands to reason that the qualifications in Article 1 are minimum requirements. In sum, the framers intended merely to insure that no state lowered the standards for being elected to the House of Representatives or Senate.

The majority states that the history surrounding the drafting of the Constitution is inconclusive, yet they rely upon that history as discussed in *Powell* v. *McCormack*, 395 U.S. 486 (1969). In *Powell*, the Court held the House of Representatives could not exclude Congressman Powell, a duly elected member of Congress, for any reason other than the qualifications set forth in the Constitution. In so holding, the Court examined the debates

---

[1]I recognize that Amendment 26 of the United States Constitution prohibits such an action; however, the actions of the framers must be examined within the proper context. At the time the Constitution was ratified, a state could abridge the right to vote by establishing a property requirement or an age restriction beyond 18 years of age.

surrounding the drafting and ratification of the Constitution itself. While it is clear that the framers discussed term limits, I am not convinced that the failure to include term limits in the Constitution prohibits the people of the states from enacting term limits.

The only "intent" that can be ascertained from the framers' exclusion of term limits is that the delegates considered it undesirable to impose a uniform tenure limitation upon the representatives of every state. However, this does not confirm that the people of each state are prohibited from enacting term limits. Even the majority recognizes that whether the States are foreclosed from adding a restriction to candidacy is not specifically addressed in the Constitution or the historical debates. Nevertheless, the majority places emphasis upon the historical debates' and Alexander Hamilton's "allusion to the fixed and immutable character of the enumerated qualifications."

Justice Holmes observed that government is an experiment. The people are the conductors of that endless experiment and have the right to tinker with it as they choose, free of unwarranted interference. Although it may make "eminently good sense" to have uniform qualifications for federal legislators in order to prevent an "imbalance among the states," I submit the drafters of the Constitution intended merely to establish uniform minimum qualifications.

Nor can I agree that the effective date of the amendment for purposes of compliance is other than January 1, 1993, the date specified in the provision. The avowed purpose of Amendment 73 is to revitalize government, inhibit voter apathy and stimulate voter participation and involvement. I can find no basis for concluding that the electorate intended to defer those objectives for an additional six years.

Amendment 73 contains an effective date and states that none of the State elected officials, whether executive or legislative, may serve more than the specified number of terms. It further proclaims that it is "applicable to all persons thereafter seeking election." The Ballot Title contained the same quoted language. The purpose of the amendment, as stated in its Preamble, is to limit the terms of elected officials who are described as an entrenched incumbency who ignore their duties and are preoc-

cupied with reelection. The language of the amendment itself read as a whole runs counter to an interpretation that it is not to take effect, practically speaking, until 2000 or thereafter.

I do not believe that Amendment 73 is a retroactive law because the amendment does not take away a vested right or impose a new obligation, duty, or disability regarding matters that already have occurred. *F.D.I.C.* v. *Faulkner*, 991 F.2d 262 (5th Cir. 1993), citing *Bowen* v. *Georgetown Univ. Hospital*, 488 U.S. 204 (1988); *Miyazawa* v. *City of Cincinnati*, 825 F.Supp. 816 (S.D. Ohio 1993); *Ficaria* v. *Dept. of Reg. Agencies*, 849 P.2d 6 (Colo. 1993). A statute does not operate retroactively merely because its application requires some reference to prior facts. *F.D.I.C.* v. *Faulkner, supra, citing McAndrews* v. *Fleet Bank of Massachusetts*, 989 F.2d 13 (1st Dir. 1993) [*citing Cox* v. *Hart*, 260 U.S. 427 1922)]. Furthermore, it is clear that holding public office is a privilege, not a vested right. *Miyazawa* v. *City of Cincinnati, supra.*

For the reasons stated, I concur in the majority opinion as to Section I (JUSTICIABILITY), Section II (ENACTING CLAUSE), Section IV (SEVERABILITY), and Section V (STATE OFFICEHOLDERS), but not as to Sections III (QUALIFICATIONS CLAUSE) and Section VI (TERMS OF SERVICE COUNTED), to which I respectfully dissent.

GEORGE K. CRACRAFT, Special Chief Justice, concurring in part, dissenting in part. I concur with the results reached in the majority opinion on the issues of justiciability, the enacting clause, the constitutionality of limitations on state elected officials, severability, and terms of service to be counted. I cannot, however, agree that the restrictions on members of the United States Congress violate the Qualifications Clauses of Article I, Sections 2 and 3 of the United States Constitution. I do not view the provisions of Amendment 73 to the Arkansas Constitution as raising a "qualifications" issue, but rather a ballot access issue to be measured by the First and Fourteenth Amendments to the United States Constitution.

Unlike Sections 1 and 2 of Amendment 73 (which apply to state elected officials), Section 3 (which applies to members of Congress) does not impose an absolute bar on incumbent suc-

cession. Instead, Section 3 merely makes it more difficult for an incumbent to be elected. Under our liberal write-in laws, an incumbent can be elected to congressional office and, if elected, serve the term for which elected. An incumbent United States Representative or Senator can also serve in the Congress under appointment to fulfill an unexpired term. In neither case would his or her qualifications to serve be in anywise affected by Amendment 73. In my view, a person is qualified within the meaning of Article I of the United States Constitution if permitted to serve if elected. While an incumbent congressional candidate's ballot access is limited, his or her qualifications to serve if elected to Congress are not affected.

The United States Supreme Court has never squarely faced this issue. However, two United States Courts of Appeals have recognized the distinction I would make between ballot access restrictions and those qualifications mentioned in Article I, and I find their decisions persuasive. *See Hopfmann* v. *Connolly*, 746 F.2d 97 (1st Cir. 1984), *vacated in part on other grounds*, 471 U.S. 459 (1985), and *Joyner* v. *Mofford*, 706 F.2d 1523 (9th Cir. 1983). In *Hopfmann*, the court stated:

> Plaintiffs next argue that the application of the 15 per cent rule [restricting which candidates' names would appear on the Democratic primary ballot to those who received at least 15 percent of the vote at the party's convention] transgresses Article I, Section 3, Clause 3 of the Constitution in that it unlawfully adds a qualification for the office of United States Senator beyond the age, citizenship and residency requirements of the Constitution.

> As the defendants have correctly pointed out, the 15 percent rule does not add a qualification that precludes Hopfmann from obtaining the office of United States Senator. The rule merely adds a restriction on who may run in the Democratic party primary for statewide political office and potentially become the party nominee. The cases cited by plaintiffs to the effect that neither Congress nor the states can add to the constitutional qualifications for office are inapposite. *Cf. Powell* v. *McCormack*, 395 U.S. 486, 547, 551, 89 S.Ct. 1944, 1977, 1979, 23 L.Ed.2d 491 (1969).

Unlike the additional requirements involved in the cases cited by plaintiffs, failure to comply with the 15 percent rule does not render a candidate ineligible for the office of United States Senator. An individual is free to run as the candidate of another party, as an independent, or as a write-in candidate. If he is elected and meets the requirements of Article I, Section 3, he will be qualified to take office. As the Wyoming Supreme Court stated in *State* v. *Crane*, 197 P.2d 864, 871 (Wyo. 1948), *the test to determine whether or not the "restriction" amounts to a "qualification" within the meaning of Article I, Section 3, is whether the candidate "could be elected if his name were written in by a sufficient number of electors."*

746 F.2d at 102-03 (emphasis added).

In my view, the Qualifications Clauses protect only the right of a person who meets the qualifications of age, citizenship, and residency to be seated in the Congress if elected. They do not address the right of any person to seek election or that of his constituents to vote for the person of their choice. Indeed, the Qualifications Clauses themselves begin with the phrase "[n]o person shall *be*" a representative or senator, a choice of words that, to my mind, clearly demonstrates that the Qualifications Clauses are addressed to service in the Congress. The rights to seek election and to vote for the candidate of one's choice are afforded the protection of the First and Fourteenth Amendments against ballot access restrictions that are too severe when measured by the balancing test set out in *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983), and *Burdick* v. *Takushi*, ___ U.S. ___, 112 S.Ct. 2059 (1992). Nor should the odds for or against the successful waging of a write-in campaign lead to the conclusion that Section 3 of Amendment 73 is a "qualification" in "ballot access clothes." Rather, such odds should be merely one factor considered along with all others in the balancing process which pits candidates' and voters' rights against the state's interest in fair and open elections, free of perceived evils of entrenched incumbency.

In our deliberations, we have applied that balancing test to Sections 1 and 2 of Amendment 73 and found that the state's interest in preventing the perceived evils outweighs the First and Fourteenth Amendment rights of state level candidates and vot-

ers therefor. In my opinion, since we have decided that Amendment 73's lifetime bar on state level incumbents passes Fourteenth Amendment muster, it must necessarily follow that the less stringent restrictions placed on members of Congress easily pass this same test.

I would hold that Amendment 73 to the Arkansas Constitution was proposed and adopted in the manner provided by law, is not constitutionally infirm in any respect, and is valid and enforceable in its entirety.

GERALD P. BROWN, Special Justice, concurring in part, dissenting in part. The enactment clause issue, which has assumed a curious prominence in this drama, is in reality a petition-sufficiency issue over which this court has original and exclusive jurisdiction. Ark. Const. amend. 7. Since the trial court based its ruling on that issue, we would ordinarily dispose of it on procedural grounds. Under the circumstances of this case, I do not believe that such a disposition would be in the public interest in as much as the enactment clause issue (along with several others) was raised in this court in a pre-election challenge. We declined to decide this issue at that time for the reasons set forth in *Plugge* v. *McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992). I agree with the majority's decision to address the enactment clause issue at this time and dispose of it on its merits.

I also agree with the majority opinion that Amendment 73 is not vulnerable to attack on the enactment clause ground. In the first place, I do not believe that Amendment 7 requires a constitutional amendment to contain an enactment clause. Even if it does, Amendment 73 substantially complies.

The initiative petition, which placed Amendment 73 on the ballot, begins, "We, the undersigned legal voters of the State of Arkansas, respectfully propose the following Amendment to the Constitution of the State of Arkansas . . ." and ends, "and by this, our petition order that the same be submitted to the people of said state, to the end that the same may be adopted, *enacted*, or rejected by the vote of legal voters of said state. . . ." (Emphasis supplied.) That does not leave much room for doubt that the voters knew that they were enacting a new law. No one has suggested that the absence of the words "Be it Enacted" misled any-

one or had any effect on the outcome of the election. To strike down Amendment 73 for want of a formal enactment clause, after it has been approved by sixty percent of the voters, would be unduly technical and would elevate form over substance.

I agree with the majority opinion which holds that section 3 of Amendment 73 is fatally flawed because it conflicts with Supremacy Clause and the Qualification Clauses of the United States Constitution.

Although the issue is not entirely free from doubt, I believe the founding fathers considered and rejected term limits for members of Congress at the time of the adoption of the United States Constitution by the Constitutional Convention in Philadelphia over two hundred years ago. [*See* authorities discussed in majority opinion and the dissenting opinion in *Plugge* v. *McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992).]

As the majority opinion recognizes, and Justice Hays forcefully argues in his dissenting opinion, whether the founding fathers intended to foreclose the states from imposing additional qualifications for Congressmen was not definitively and categorically settled. In fact, Justice Hays makes a strong case for "minimum" rather than "exclusive" qualifications. But the action finally taken by the framers of the constitution, following exhaustive debates, is strong evidence that term limits for senators and representatives was rejected. Certainly that is the most plausible interpretation; and the specter of the hodge-podge of qualifications which a contrary holding might engender is daunting enough to swing the balance.

Congressional officeholders partake of the same national character as the President of the United States. Members of Congress pass laws which affect not only their own state, but all the states. They are part of the national team which was created by the Continental Congress. The rules which govern their qualifications are contained in the Constitution of the United States. Uniformity of qualifications is paramount, and individual states are not free to engraft variations. The terms for members of Congress can be limited only by amending the United States Constitution.

Does the constitutional infirmity of section 3 vitiate the

entire amendment, or is the serum provided by the severability clause strong enough to prevent the spread of the infection?

In *Combs* v. *Glenn Falls Ins. Co.*, 237 Ark. 745, 375 S.W.2d 809 (1964), this court held that the test of the efficacy of a severability clause is whether the measure would have passed without the unconstitutional portion.

There is no way for this court to determine whether the voters would have approved term limits for state officeholders if section 3 had not been in the picture. The sponsors of Amendment 73 created this uncertainty and, therefore, had the onus to furnish this court something to go on besides speculation. There is nothing in the record to show that this dichotomous issue was explained to the voters in a meaningful way. In short, there was not a straightforward, up-or-down vote on term limits for state officeholders.

There can be no serious doubt that a state has plenary power to impose term limits on state officials, provided it is accomplished in a constitutionally permissible manner. The sponsors of Amendment 73 obviously knew that section 3 was of questionable constitutionality because of the different approach they used: ballot access. They knew that most of the public discussion of term limits had been in the context of congressional officeholders. When they chose to blanket the two groups (state and federal officeholders) into one unified package, the voters had no choice to approve one without the other. The two groups were not only inextricably linked — they were systemically fused in such a manner that each ceased to have a separate existence for voting purposes. Although section 3 is couched in ballot-access terminology, the distinction between outright bar and ballot-access is too fine a point for the average voter to grasp.

The practice of coupling a legitimate objective with one of doubtful legality, papered over with a severability clause, is not fair to voters. It is misleading at the very least, if not downright deceptive, and should be discouraged. We should make it clear to sponsors of constitutional amendments and initiated acts that they are skating on thin ice when they rely on the redemptive power of a severability clause to bail out a shaky joinder. Such a posture will promote truth-in-packaging and thus be voter-friendly.

While "The States' Rights Amendment" involved in *Hoban v. Hall*, 229 Ark. 416, 316 S.W.2d 185 (1958), discussed at length in Justice Dudley's dissent herein, is admittedly an extreme example, it is illustrative of an effort to couple a legitimate public concern with a less laudable objective, with potential far-reaching consequences. The court simply ignored the severability clause in *Hoban* and treated it as a ballot title issue rather than a severability clause issue. Of course, those are separate issues, but they have in common the potential for unfairness to voters.

Sections 1, 2, and 3 of Amendment 73 were presented to the voters as an "all or nothing" package. State and federal officials were lumped together and referred to in the Preamble as "elected officials." Section 6 stated that the provisions of Amendment 73 shall be applicable to "the offices specified in this Amendment." The offices specified are state and federal officeholders.

Since section 3 cannot pass constitutional muster, sections 1 and 2 must also fall.

I respectfully dissent from the majority holding that the severability clause saved sections 1 and 2.