**CITIZENS FOR LEGISLATIVE CHOICE, Michigan Handicapped Voters' Rights Association, Ruby M. Turner, Victor L. Marsh, Matthew McNeely and Evelyn Spence, Plaintiffs,**

v.

**Candice S. MILLER, Secretary of State of Michigan, Defendant,**

**Taxpayers United for Term Limitation, Allan Schmid, and Patrick Anderson, Intervening Defendants.**

No. Civ. 97–CV–73777–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 5, 1998.

Robert A. Sedler, Otto J. Hutzel, Detroit, MI, John E. Mogk, Grosse Pointe Park, MI, Gregory I. Gilbert, Wyandotte, MI, for plaintiffs.

Gary P. Gordon, Asst. Atty. Gen., Lansing, MI, for defendant.

Michael A. Zagaroli, Daniel Brubaker, Grand Rapids, MI, Stephen J. Safranek, Detroit, MI, for intervening defendants.

## OPINION

DUGGAN, District Judge.

This action concerns the constitutionality of art. 4, § 54 of the Michigan Constitution. Section 54 provides for lifetime term limits for state legislators.

In the 1992 Michigan general election, the following proposed amendment to the Michi-

gan Constitution was placed on the ballot as "Proposal B:"

**A PROPOSAL TO RESTRICT/LIMIT THE NUMBER OF TIMES A PERSON CAN BE ELECTED TO CONGRESSIONAL, STATE EXECUTIVE AND STATE LEGISLATIVE OFFICE**

The proposed constitutional amendment would:

Restrict the number of times a person could be elected to certain offices as described below:

1) U.S. Senator: two times in any 24-year period.

2) U.S. Representative: three times in any 12-year period.

3) Governor, Lieutenant Governor, Secretary of State or Attorney General: two times per office.

4) State Senator: two times.

5) State Representative: three times.

Office terms beginning on or after January 1, 1993 would count toward the term restrictions. A person appointed to an office vacancy for more than one-half of a term would be considered elected once in that office.

Should this proposal be adopted?

This ballot language was prepared by the State Board of Canvassers, as required by art. 12, § 2, cl. 3 of the Michigan Constitution. The initiative petition from which this statement was derived contained the complete text of the proposed changes to the Michigan Constitution, i.e., art. 2, § 10, art. 4, § 54, and art. 5, § 30.[1]

Proposal B received the support of approximately 58.8% of the voters. The text of art. 4, § 54, the constitutional provision at issue in this action, provides:

No person shall be elected to the office of state representative more than three times. No person shall be elected to the office of state senate more than two times. Any person appointed or elected to fill a vacancy in the house of representatives or the state senate for a period greater than one half of a term of such office, shall be considered to have been elected to serve one time in that office for purposes of this section. This limitation on the number of times a person shall be elected to office shall apply to terms of office beginning on or after January 1, 1993.

This section shall be self-executing. Legislation may be enacted to facilitate operation of this section, but no law shall limit or restrict the application of this section. If any part of this section is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect.

On August 1, 1997, plaintiffs filed a complaint against defendant Candice Miller, Michigan's Secretary of State. The complaint alleged that § 54 violates plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. On October 15, 1997, the Court granted the motion of Taxpayers United for Term Limitation ("Taxpayers"), Allan Schmid, and Patrick Anderson (collectively "intervening defendants") to intervene as defendants in the instant action. On October 24, 1997, plaintiffs amended their complaint to add a claim that the process by which the Michigan voters adopted § 54 violated the First and Fourteenth Amendments to the United States Constitution. Plaintiffs seek, *inter alia,* a declaratory judgment that § 54 violates their First and Fourteenth Amendment rights and a permanent injunction against Miller from enforcing § 54.

Currently before the Court are plaintiffs' and intervening defendants, cross motions for summary judgment pursuant to Fed. R.Civ.P. 56. Defendant Miller has also moved for summary judgment and, in the alternative, seeks dismissal of this action pursuant to Fed.R.Civ.P. 12(b)(1). The Court held a hearing on these motions on January 29, 1998.

---

1. Art. 2, § 10 (term limits on U.S. Representatives and Senators) and art. 5, § 30 (term limits on state executive officers) are not subjects of the instant litigation. The U.S. Supreme Court found that states do not have the power to impose term limits on members of the U.S. Congress in *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

**1044**

## Discussion

### Standing

■ Defendant Miller argues that plaintiffs lack standing and that this action should therefore be dismissed pursuant to Fed. R.Civ.P. 12(b)(1).[2]

"Article III of the United States Constitution provides that parties attempting to invoke federal jurisdiction must allege an actual case or controversy." *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 127 (6th Cir.1995).

> One of [the] landmarks, setting apart the "Cases" and "Controversies" that are of the justiciable sort referred to in Article III—"serv[ing] to identify those disputes which are appropriately resolved through the judicial process," *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)—is the doctrine of standing.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). In *Lujan*, the Supreme Court identified three components of the standing requirement:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560–61, 112 S.Ct. at 2136 (citations omitted).

**2.** Rule 12(b)(1)provides that a defendant may assert the defense of "lack of jurisdiction over the subject matter" by motion.

**3.** Plaintiffs McNeely and Spence are represented in the Michigan House of Representatives by Rep. Ilona Varga, for whom they wish to vote in the 1998 election for the Michigan House. Plaintiffs Turner and Marsh are represented in

Defendant Miller argues that the individual plaintiffs, i.e., Turner, Marsh, McNeely, and Spence, cannot establish that they have suffered an "injury in fact."

In support for her argument, defendant relies on *Miyazawa*. In *Miyazawa*, the plaintiff challenged an amendment to Cincinnati's city charter limiting city council members to four consecutive terms in office. The *Miyazawa* court commented, "[a]s the effect of [the amendment to the city charter] is not retroactive for persons who had already served four consecutive two-year terms when it went into effect, it would be difficult to identify a candidate presently who would be affected by this provision." 45 F.3d at 128 (citation omitted). The plaintiff's position in *Miyazawa* was distinguishable from cases in which "the plaintiff/voter had a personal stake in the outcome of the election (i.e., the voter was a potential candidate, a supporter of the potential candidate, or was unable to vote for his specific candidate of choice due to the subject law)." *Id.* (citing *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Erum v. Cayetano*, 881 F.2d 689 (9th Cir.1989); *Henderson v. Ft. Worth Independent School Dist.*, 526 F.2d 286 (5th Cir. 1976)). The court concluded that the plaintiff lacked standing to pursue her action because she merely alleged that "sometime in the future she may want to vote for an unidentified candidate who may not meet the requirements of the subject legislation." 45 F.3d at 128.

The instant case is distinguishable from *Miyazawa* because plaintiffs' injury is not merely conjectural. Plaintiffs desire to vote for specific candidates in an upcoming election.[3] They allege that by preventing their chosen candidates from running, § 54 violates their First and Fourteenth Amendment rights. Plaintiffs' chosen candidates must file to run in the 1998 election by May 12, 1998. Because § 54 prevents plaintiffs from

the Michigan House by Representative Mary Lou Parks, and they wish to vote for Rep. Parks in the upcoming election. Reps. Varga and Parks have stated that they would run for reelection in 1998 if they were not prevented from doing so by § 54's prohibition against serving more than three terms in the Michigan House after 1993.

voting for their chosen candidates in 1998, their alleged injury is both real and imminent. *See Zielasko v. State of Ohio*, 873 F.2d 957 (6th Cir.1989) (holding that a municipal judge and a political supporter of the judge had standing to challenge an age restriction on running for judicial office); *see also Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 704, 7 L.Ed.2d 663 (1962) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue.").

■ Defendant Miller argues that plaintiffs will not suffer imminent harm to their constitutional rights because, if the Court were to determine that lifetime term limits are unconstitutional, § 54's severability clause would require the Court to interpret § 54 as prohibiting candidates from serving three *consecutive* terms in office.[4] The Court rejects this argument because § 54 cannot be read as imposing consecutive term limits,[5] and even if it could, the Court does not believe that the constitutional problems alleged by plaintiffs would necessarily be eliminated by interpreting § 54 as imposing consecutive term limits.[6]

■ Finally, Defendant argues that Citizens and Handicapped Voters lack standing. [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the suit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Defendant believes that Citizens and Handicapped Voters lack standing because their members have not suffered an injury in fact and because these plaintiffs have not shown how this action is germane to their organizational purposes.

The Court rejects these arguments. Plaintiffs Turner and Marsh are members of Citizens, and plaintiffs McNeely and Spence are members of Handicapped Voters. (Stipulation of Facts ¶¶ 5–6.) As discussed above, the individual plaintiffs have met the injury in fact requirement. Furthermore, both Citizens and Handicapped Voters have the goal of ensuring voter choice in the Michigan Legislature. *Id.* Accordingly, the Court concludes that plaintiffs meet the requirements for standing.

*Constitutionality of Section 54*

■ All parties to this action have moved for summary judgment with respect to the constitutionality of § 54, and the parties have submitted a joint stipulation of facts upon which their respective arguments are based. Since there is no material issue of fact in dispute, this case may appropriately be decided by summary judgment.

Plaintiffs argue that § 54's lifetime term limits violate their "right to vote for a candidate of one's choice … [and] the right of

4. Defendant Miller contends that "plaintiffs do not contest the constitutionality of consecutive term limits." (Def Mem. in Supp. of Summ. J. at 3.) Plaintiffs do not, in fact, concede that consecutive term limits are constitutional. (Pl. Reply Br. at 9.)

5. The severability clause does not authorize this Court to make the alteration suggested by defendant; it merely states that "the remaining parts of this section shall not be affected but will remain in full force and effect" if any part of § 54 is held to be unconstitutional. In any event, courts may not supply limiting language to state laws to make them constitutional. *See Vittitow v. City of Upper Arlington*, 43 F.3d 1100, 1106 (6th Cir.1995).

6. Defendant Miller also argues that the issues in this action are not ripe for adjudication, or, alternatively, that the Court should decline to exercise jurisdiction under the Declaratory Judgment Act because plaintiffs are only faced with "speculative future injuries." *See Aetna Cas. & Sur. Co. v. Sunshine Corp.*, 74 F.3d 685, 687 (6th Cir.1996) ("It is well settled that jurisdiction to grant relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, is discretionary."); *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir.1985) ("The ripeness doctrine not only depends on the finding of a case and controversy under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances."). As discussed *supra*, plaintiffs are faced with an imminent deprivation of their constitutional rights as voters. Therefore, the Court concludes that the action is ripe for adjudication and that it is appropriate to exercise jurisdiction under the Declaratory Judgment Act.

citizens to associate for the advancement of political beliefs, protected by the First Amendment."

Candidate qualification rules implicate " 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' " *Anderson v. Celebrezze*, 460 U.S. 780, 786–87, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968)). These rights are protected by the First and Fourteenth Amendments. *Id.* Furthermore, restrictions on the right to vote that amount to "invidious discrimination" have been held to violate the Equal Protection Clause of the Fourteenth Amendment. *See Williams*, 393 U.S. at 34, 89 S.Ct. at 12; *see also Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964).

The Supreme Court enunciated the method by which courts should analyze challenges to state election laws in *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992):

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." [*Anderson*, 460 U.S.,] at 789, 103 S.Ct., at 1570; *Tashjian, supra*, 479 U.S.; at 213–214, 107 S.Ct., at 547–548.

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restriction. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1596–1570.

## 1. Severity of the Burden Placed on Plaintiffs' Voting Rights

Plaintiffs argue that § 54 imposes a "severe" restriction on their right to vote because it permanently deprives them of the opportunity to vote for the candidates of their choice.

The Court does not agree that § 54 imposes a severe restriction on plaintiffs, voting rights. While § 54 narrows the field of candidates for whom plaintiffs may vote, it does so only slightly. Plaintiffs remain free to vote for any candidate who has not served three terms in the state house since January 1, 1993. *Cf. Timmons v. Twin Cities Area New Party*, 520 U.S. 351, ——, 117 S.Ct. 1364, 1372, 137 L.Ed.2d 589 (1997) (ruling that a state's ban against running for office as the candidate for more than one party did not impose a severe burden on the plaintiff's associational rights because it reduced the number of potential candidates that a party could nominate by a small degree). Furthermore, plaintiffs are free to vote for Reps. Parks and Varga if they run for other offices. Plaintiffs are not "guaranteed the right to vote for a specific candidate." *Zielasko v. State of Ohio*, 873 F.2d 957, 961 (6th Cir. 1989) (upholding a provision of the Ohio constitution that prohibited persons age 70 and over from being elected to judicial office); *see also Stiles v. Blunt*, 912 F.2d 260, 266 (8th Cir.1990) ("[voters'] fundamental rights of voting, speech, and association do not confer on them an absolute right to support a specific candidate regardless of whether he or she has satisfied reasonable eligibility requirements.")

Citing the Supreme Court's decision in *Anderson*, plaintiffs argue that § 54 is discriminatory and content based because it favors a so called "novice" viewpoint of repre-

sentative democracy over an "experience" viewpoint of representative democracy by restricting voters, ability to associate with "experienced" candidates. In *Anderson*, the Supreme Court recognized the right of voters to associate with candidates who reflect their views:

> [V]oters can assert their preferences only through candidates or parties or both. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).... The exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens.

460 U.S. at 787–88, 103 S.Ct. at 1569. The *Anderson* Court invalidated an Ohio law establishing an early fling deadline for independent candidates because the law placed "a particular burden on an identifiable segment of Ohio's independent-minded voters." 460 U.S. at 792, 103 S.Ct. at 1572.

Unlike Ohio's early filing deadline, § 54 does not restrict the ability of voters to elect candidates based on their substantive political views and, therefore, does not significantly interfere [7] any individual's right to vote for candidates who share his or her political views. A prospective candidate who has served three terms and who shares a voter's "views on the issues of the day" is barred from seeking office to the same extent as a similarly situated candidate who holds the opposite point of view. Therefore, § 54 does not distinguish between candidates based on their political beliefs or point of view and does not violate plaintiffs, voting rights under *Anderson.*

Plaintiffs also believe that § 54 improperly impacts on an identifiable "class" of candidates, i.e., candidates with experience. Plaintiffs rely on the recent Supreme Court decision in *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 1871, 131

L.Ed.2d 881 (1995), in which the Court invalidated state imposed limits on the length of service in the United States Congress because "the Framers decided that the qualifications for service in the Congress of the United States be fixed in the Constitution and be uniform throughout the Nation." In reaching this conclusion, the Court noted that term limits "impose[d] ... substantive qualifications rendering a class of potential candidates ineligible for ballot position" and "excluded candidates from the ballot without reference to the candidates, support in the electoral process." 115 S.Ct. at 1870. While the *Thornton* Court expressed disapproval of a state or Congress imposing such "qualifications" on federal office holders, the Court did not extend its holding to term limits on state officeholders:

> The merits of term limits, or "rotation," have been the subject of debate since the formation of our Constitution, when the Framers unanimously rejected a proposal to add such limits to the Constitution. The cogent arguments on both sides of the question that were articulated during the process of ratification largely retain their force today. *Over half the States have adopted measures to impose such limits on some offices either directly or indirectly,* and the Nation as a whole, notably by constitutional amendment, has imposed a limit on the number of terms the President may serve. Term limits, like any other qualification for office unquestionably restrict the ability of voters to vote for whom they wish. On the other hand, such limits may provide for the infusion of flesh ideas and new perspective, and may decrease the likelihood that representatives will lose touch with their constituents. *It is not our province to resolve this longstanding debate.*

*Id.* 115 S.Ct. at 1871 (emphasis added); *see also Bates v. Jones,* 131 F.3d 843, 847 n. 1 (9th Cir., 1997) (*en banc*) (*Thornton* "does not provide support for the argument that [California's] term limits are unconstitutional."). The Court does not read *Thornton* as

---

**7.** It simply restricts the ability to elect *some* individuals who may share an individual voter's views, i.e., those candidates who have served three terms.

holding that states may not impose term limits on state officeholders.

Finally, plaintiffs argue that § 54's burden falls disproportionately on racial minorities and inner-city residents because such voters rely on legislators who gain positions of power through seniority to advance the voters, political interests. According to plaintiffs:

> Since these groups are unable on their own to elect a substantial number of legislators to represent their interests, they must rely on experienced and incumbent legislators who can make use of their long service and seniority to advance their interests.... The same need to rely on incumbent legislators to advance their interests is not present for residents of predominantly white suburban districts, for example, since there are a large number of representatives from predominantly white suburban districts in the legislature, and those legislators can vote together to advance the interests of their politically more powerful constituencies.

(Pl.Br. in Supp. of Mot. for Summ.J. at 18–19.) As factual support for their argument, plaintiffs rely on the fact that a majority of voters from thirteen Detroit voting districts and one Flint district voted against term limits. Plaintiffs also rely on the fact that house members from those districts hold several important positions in the house.

This is scant evidence from which to conclude that minority and inner-city voters are unfairly disadvantaged by § 54. White and suburban voters would lose the ability to gain political power through seniority to the same extent as would minority and inner city voters. In the Court's view, the fact that a majority of voters in a number of inner-city districts voted against term limits does no more than indicate that the voters making up the majority in those districts had a prefer-ence for a system without term limits. Even if this tends to show that those voters made a judgment that they would have more political power in relation to other groups of voters in a system without term limits, the Court has no basis to conclude that this judgment was correct. Furthermore, the fact that legislators from these districts have attained high positions is not indicative that terms limits will prevent such legislators from obtaining these positions in the future.

In sum, the Court concludes that § 54 imposes an insubstantial, content neutral, and nondiscriminatory burden on the voting rights of plaintiffs.[8] The Court now turns to the interests asserted by Michigan to justify any burdens § 54 imposes on plaintiffs, right to vote.

### 2. Michigan's Interests

Defendant Miller and intervening defendants argue that the slight burden imposed on plaintiffs by § 54 is justified by Michigan's interest in "maintaining the integrity of the state's political institutions and representative democracy." (Def.Mem. in Supp. of Summ.J. at 20.) "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." *Timmons*, 520 U.S. at ——, 117 S.Ct. at 1373; *see also Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S.Ct. 1013, 1024, 103 L.Ed.2d 271 (1989) ("A state indisputably has a compelling interest in preserving the integrity of its election process.")

Defendants argue that lifetime term limits serve this interest by helping rid the system of perceived problems such as the ability of long serving legislators to steer a disproportionate amount of state resources to their

---

**8.** The Court is not alone in reaching the conclusion that lifetime term limits do not impose a severe burden on the right to vote. *See Bates*, 131 F.3d at 846–47 (lifetime term limits on state officers and legislators); *Dutmer v. City of San Antonio*, 937 F.Supp. 587, 592 (W.D.Tex.1996) (lifetime term limits on city council members); *Nevada Judges Association v. Lau*, 112 Nev. 51, 910 P.2d 898, 901 (1996) (lifetime term limits on state judges); *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349, 360 (1994) (lifetime term limits on state officers and legislators); *aff'd on other grounds*, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995); *see also Legislature of State of California v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309, 1329 (1991) (concluding that California's "legitimate and compelling" interest in imposing lifetime term limits on state legislators and various state officers "outweigh the narrower interests of petitioner legislators and the constituents who wish to perpetuate their incumbency.")

communities, the advantages of incumbency in elections, the existence of an entrenched political leadership, the power of special interest groups that contribute money to election campaigns, and "ideological drift," i.e., the tendency for the political views of representatives to diverge from those held by their constituents.[9]

Certainly, a rational argument could be made that lifetime term limits would help solve these "problems," at least to the extent that these problems are caused by incumbency. The Supreme Court has noted that term limits "may provide for the infusion of fresh ideas and new perspectives, and may decrease the likelihood that representatives will lose touch with their constituents." *Thornton*, 115 S.Ct. at 1871; *see also Legislature of the State of California v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309, 1327–28 (1991) (citing potential benefits of term limits). The potential value of term limits in combating the problems of incumbency is shown implicitly by the fact that the Federal Government and many states have imposed term limits on various offices. *See U.S. Const.* amend. XXII (term limits on the President); *League of Women Voters v. Diamond*, 965 F.Supp. 96, 103 (D.Me.1997) ("[O]ver half the states have gubernatorial term limits and over one third have enacted term limits on state legislators.").

Plaintiffs argue that Michigan had no compelling state interest in adopting § 54 because incumbency is not a problem in Michigan. Plaintiffs cite the fact that the average turnover[10] the last six house elections was 19.1% and the average turnover in the last four senate elections was 35.5%. According to plaintiffs, this is a "reasonable" amount of turnover.[11]

■ Defendant need not show a compelling state interest because the Court has concluded that § 54 imposes only a slight burden on plaintiffs' right to vote. *See Timmons*, 520 U.S. at ——, 117 S.Ct. at 1373. The Supreme Court has recognized the "authority of the people of the States to determine the qualifications of their most important officials." *Gregory v. Ashcroft*, 501 U.S. 452, 463, 111 S.Ct. 2395, 2402, 115 L.Ed.2d 410 (1991). So long as there is a rational basis for term limits, the Court should not substitute its judgment for the Michigan voters on this maker. *See Zielasko*, 873 F.2d at 961–62.[12]

The Court is satisfied that the minimal impact on plaintiffs' voting rights is justified by Michigan's asserted interests. Therefore, the Court holds that § 54 does not violate plaintiffs' First and Fourteenth Amendment rights.

---

9. At the hearing held on January 29, 1998, counsel for plaintiffs argued that Michigan cannot present a justification for the burden § 54 places on plaintiffs' right to vote because the interests cited by defendant Miller are not supported by facts in the record and they were not set forth in Proposal B as "legislative findings." The Supreme Court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons*, 520 U.S. at ——, 117 S.Ct. at 1372. In addition, this Court does not read the relevant case law as imposing a requirement that the "precise interests put forward by the State as justifications for the burden imposed by its rule," *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570, be set forth in "legislative findings." *See Zielasko*, 873 F.2d at 961 ("Whether or not [the reasons advanced by the state in justification of art. IV, § 6(C) of the Ohio Constitution] were actually considered in establishing section 6(C) is irrelevant."); *cf. 37712, Inc. v. Ohio Dept. Of Liquor Control*, 113 F.3d 614, 622 (6th Cir.1997) ("[A]n enactment subject to 'rational relationship' equal protection review must be sustained if any conceivable basis rationally supports it.")

10. This turnover includes legislators who left office early, legislators who did not seek reelection, and legislators who lost in primary or general elections.

11. While plaintiffs believe that this is a reasonable amount of turnover, a majority of the voters apparently did not agree. In fact, the average turnover for the three elections preceding the general election in 1992 (1986, 1988, and 1990) was less than 15% in the House of Representatives. (Stipulation of Facts ¶ 16.)

12. Plaintiffs also argue that Michigan could achieve its goals by less burdensome means, such as consecutive term limits, the restriction of perquisites to prevent their misuse, and public funding of legislative campaigns. Because the Court has concluded that the burden of lifetime term limits is not severe, § 54 need not be "narrowly tailored" to achieve the state's interests. *See Timmons*, 520 U.S. at ——, 117 S.Ct. at 1373.

*Notice*

■ Plaintiffs next argue that the initiative process used to enact § 54 was constitutionally defective because it did not adequately inform the voters of the severe restriction § 54 would impose on their fundamental right to vote.

Plaintiffs argue that the Constitution requires "governmental bod[ies]" to have an adequate understanding of the underlying facts when their actions "impose severe restrictions on fundamental rights." In support of this argument, plaintiffs cite several cases in which the Supreme Court invalidated governmental actions because they violated the plaintiffs, procedural due process rights or the plaintiffs' First Amendment rights due to the absence of adequate procedural safeguards. *See e.g., Greene v. McElroy,* 360 U.S. 474, 508, 79 S.Ct. 1400, 1419–20, 3 L.Ed.2d 1377 (1959); *State of Washington v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 561–62, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975). However, none of these cases applied procedural due process and First Amendment concepts to state initiative processes.[13]

Assuming that plaintiffs have enunciated the correct standard for reviewing the sufficiency of the instant initiative process, the Court finds that the voters did have "adequate" notice regarding § 54. Section 54 states flatly, "No person shall be elected to the office state representative more than

three times."[14] The ballot language was equally unambiguous, stating that the amendment to the constitution would "[r]estrict the number of times a person could be elected to certain offices as described below: ... 5) State Representative: three times." There is no indication that this language is less than absolute. *See Bates,* 131 F.3d at 846. In addition, the lifetime nature of the term limit was emphasized by the fact that the ballot also provided that U.S. Senators could serve two terms in a 24 year period and U.S. Representatives could serve three terms in a 12 year period.

While, as plaintiffs suggest, it was possible for Proposal B's drafters to add the term "in a lifetime" to § 54's language, this addition was not necessary because the ballot's existing language was quite clear. Significantly, plaintiffs acknowledge that, for constitutional construction purposes, § 54's language unambiguously imposes lifetime term limits. The Court sees no reason why the Michigan voters would read § 54's unambiguous words in a different way than would lawyers and judges.[15]

This Court believes that *Burton v. Georgia,* 953 F.2d 1266, 1269 (11th Cir.1992), provides the correct standard for reviewing a state's handling of an initiative election. In *Burton,* the Court declared that where there are no systematically discriminatory election procedures, a plaintiff's right to vote will be violated only if the election is conducted in a patently and fundamentally unfair manner.

13. The Court has serious doubts that plaintiffs' procedural due process rights are implicated by the state's handling of the initiative process. *See 37712, Inc. v. Ohio Dept. of Liquor Control,* 113 F.3d 614, 619 (6th Cir.1997).

14. Notably, § 54's language is almost identical to the Twenty Second Amendment's limit on the number of terms an individual may serve as President. *See U.S. Const.* amend XXII ("No person shall be elected to the office of the President more than twice."). In the Ninth Circuit's original decision in *Bates,* the majority of the panel found that California's term limit provision could be read to create consecutive term limits because it stated that " '[n]o Senator' and '[n]o Member of the Assembly' may serve more than two or three terms respectively" and it could be read to apply only to sitting senators and assemblymen. 127 F.3d at 856 (9th Cir.1997). The *Bates* majority then stated that the provision's

drafters "easily could have presented to the voters an unambiguous lifetime-ban provision by simply tracking language of the [Twenty Second Amendment]." *Id.* at 856 n. 21.

15. Plaintiffs also argue that the voters were entitled to receive adequate notice regarding the effect of Proposal B because Proposal B constituted a "waiver" of Michigan voters, fundamental right to vote. In support of this argument, plaintiffs cite *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *Johnson* involved waiver of the right of assistance of counsel at trial. In the Court's view, it is improper to characterize the passage of Proposal B as a waiver of constitutional rights. The Court is aware of no case in which a court held that voters had collectively "waived" a constitutional right by passing a law through the public initiative process.

Thus, for a state ballot initiative to be invalidated,

> it must be demonstrated that the state's choice of ballot language so upset the even-handedness of the referendum that it worked a "patent and fundamental unfairness" on the voters. Such an exceptional case can arise, in the context of a case such as this one, only when the ballot language is so misleading that voters cannot recognize the subject of the amendment at issue....
>
> As long as citizens are afforded a reasonable opportunity to examine the full text of the proposed amendment, broad gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted on. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue.

*Id.* at 1269; *see also Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir.1978) ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated.")

Under this standard, Michigan's initiative process did not violate the right to vote. Plaintiffs have alleged no systematic discrimination in the state initiative process that could have tainted the results, and the ballot language in this case was not misleading. The ballot language clearly indicated that under the proposed amendment an individual could be elected as a state representative three times. Furthermore, the ballot language was drafted through a process well suited to ensure the fairness of the language. This process included a public meeting held by the State Board of Canvassers, at which proponents and opponents of the amendment had the opportunity to propose ballot language. No one sought review of the final language adopted by the Board of Canvassers.[16] Finally, as required by Michigan law, the text of the proposed amendment and the ballot language were posted in each polling place and furnished to the news media. Thus, both the language and the process by which it was draped and disseminated indicate the fairness of the ballot election, and the Court is satisfied that the initiative process satisfies the standard set forth in *Burton.* Therefore, the Court concludes that Michigan has satisfied any "notice" requirement imposed by the Constitution.

In rendering this Opinion, the Court expresses no view as to whether or not term limits are a "good idea." Plaintiffs contend that, "[t]erm limits are built into the democratic process" because, at each election, the voters have the choice of whether or not to return an individual to office. (Pl.Br. in Supp. of Mot. for Summ.J. at 17 n. 14.). This argument is not without merit. However, this Court's function is not to pass upon the wisdom of the voters' decision to adopt term limits; its function is simply to decide if § 54 violates plaintiffs' constitutional rights. This Court is satisfied § 54 does not violate plaintiffs' constitutional rights.

### *Conclusion*

For the reasons set forth above, the Court concludes that plaintiffs have standing to assert their claims in this Court. The Court also concludes that § 54 does not violate plaintiffs, constitutional rights. Therefore plaintiffs, motion for summary judgment shall be denied. Defendants, motions for summary judgment shall be granted and this action shall be dismissed.

An *Order consistent with this Opinion* shall issue forthwith.

---

**16.** Mich.Comp.Laws 168.479 provides, "Any person or persons, feeling themselves aggrieved by any determination made by said board, may have such determination reviewed by mandamus, certiorari, or other appropriate remedy in the supreme court."