**CITIZENS FOR LEGISLATIVE CHOICE,** a Michigan Non–Profit Corporation; **Michigan Handicapped Voters' Rights Association,** a Michigan Non–Profit Corporation; **Ruby M. Turner; Victor L. Marsh; Matthew McNeely; and Evelyn Spence,** Plaintiffs—Appellants,

v.

**Candice S. MILLER,** Secretary of State of Michigan, Defendant–Appellee,

**Taxpayers United for Term Limitations; Allan Schmid; and Patrick Anderson,** Intervenors–Appellees.

No. 98–1196.

United States Court of Appeals, Sixth Circuit.

Argued April 24, 1998.

Decided May 14, 1998.

Robert A. Sedler (argued and briefed), Otto J. Hetzel (briefed), Wayne State University Law School, Detroit, MI, for Plaintiffs–Appellants.

Katherine C. Galvin (briefed), Office of the Attorney General of Michigan, Lansing, MI, Daniel C. Brubaker (briefed), Mika, Meyers, Beckett & Jones, Grand Rapids, MI, for Appellees.

Michael A. Zagaroli (argued), Daniel C. Brubaker (briefed), Mika, Meyers, Beckett & Jones, Grand Rapids, MI, for Intervenors–Appellees.

Before: SUHRHEINRICH, SILER, and GILMAN, Circuit Judges.

## OPINION

SILER, Circuit Judge.

A Michigan constitutional amendment imposes lifetime term limits on state legislators. The plaintiffs, four voters and two public interest groups, claim that the amendment violates their rights under the First and Fourteenth Amendments of the United States Constitution. They sued Michigan's Secretary of State to enjoin enforcement of the amendment. The district court upheld the law and granted summary judgment for Michigan. We AFFIRM.

## I. Background

The parties stipulated to the facts. For many years, Michigan legislators had been winning reelection consistently. Incumbent legislators who sought reelection would retain their seats over ninety-two percent of the time. In 1992, a large majority of Michigan voters, 58.8 percent, approved a constitutional amendment to impose term limits on many state and federal officials, including state legislators, state executives, and federal congressmen. It added the following language, in pertinent part, to Michigan's constitution:

> No person shall be elected to the office of state representative more than three times. No person shall be elected to the office of state senate more than two times.... This limitation on the number of times a person shall be elected to office shall apply to terms of office beginning on or after January 1, 1993.
>
> This section shall be self-executing. Legislation may be enacted to facilitate operation of this section, but no law shall limit or restrict the application of this section. If any part of this section is held to be invalid or unconstitutional, the remaining parts of this section shall not be affected but will remain in full force and effect.

MICH. CONST. art. 4, § 54. Section 54 imposes "lifetime" term limits as opposed to "consecutive" term limits. Lifetime term limits forever bar officials from serving more than a set number of terms, whereas consecutive term limits allow them to serve an indefinite number of terms so long as they periodically leave office. Section 54 will impact state representatives beginning with the 1998 primary elections. It will prevent 65 out of Michigan's 110 representatives from seeking reelection.

The plaintiffs are four individual voters and two non-profit corporations, the Citizens for Legislative Choice and the Michigan Handicapped Voters' Rights Association. The two corporate plaintiffs, as their names suggest, seek to promote voting choices generally. The individual plaintiffs seek to vote for representatives subject to the term limits. They reside in the districts of two state representatives, Mary Lou Parks and Ilona Varga, who are prohibited from running for reelection by § 54. Both representatives state that they would seek reelection if possible. The plaintiffs voted for them in the prior election and assert that they would do so again. They also voted against the amendment, as did a majority of the voters

in their districts. The defendant in this case is, in effect, the State of Michigan. Intervening on Michigan's behalf are the Taxpayers United for Term Limitations, another nonprofit corporation, and two of its representatives.

The plaintiffs contend that § 54 violates their First and Fourteenth Amendment rights to vote for their preferred legislative candidates. They do not challenge the provisions that affect state executive officers, and both sides agree that the congressional term limits are unconstitutional. The plaintiffs seek a declaratory judgment holding § 54 unconstitutional, and a permanent injunction requiring Michigan to place all the excluded candidates on the ballot.

## II. Jurisdiction

■ The plaintiffs claim that this court has federal question jurisdiction because § 54 violates their First and Fourteenth Amendment rights. They rest jurisdiction on 28 U.S.C. §§ 1331, 1343(a)(4), and 2201. Michigan's counsel concedes that federal jurisdiction exists. Despite this agreement, a federal court has a responsibility to establish that jurisdiction is proper. *Moore v. McCartney*, 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976). We may exercise federal question jurisdiction over this case only if it presents a substantial federal question. *Id.*

There is authority that, in general, a state's decision to limit the terms of its elected officials raises no substantial federal question. *State ex rel Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607, *appeal dismissed, Moore v. McCartney*, 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976). In *Maloney*, the State of West Virginia imposed consecutive term limits on its governor. A gubernatorial candidate sued to enforce the limits, and the incumbent governor responded by challenging their constitutionality. The governor argued that term limits violated section one of the Fourteenth Amendment by denying equal protection of the laws to voters who wished to reelect him to a third consecutive term.

The Supreme Court of West Virginia upheld the term limits. *Maloney*, 223 S.E.2d at 612–13. It found that West Virginia's interests outweighed any incidental burden on the franchise. *Id.* The governor then appealed to the United States Supreme Court. In a one-sentence opinion, the Court held that "[t]he appeal is dismissed for want of a substantial federal question." *Moore*, 425 U.S. at 946, 96 S.Ct. 1689. The *Moore* Court dismissed the appeal "on the ground that limits on the terms of state officeholders do not even raise a substantial federal question under the First and Fourteenth Amendments." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 925, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Thomas, J., joined by three other justices, dissenting on another issue).

■ Although a summary dismissal, *Moore* binds all lower courts until subsequent Supreme Court decisions suggest otherwise. *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). The "precedential value of a dismissal for want of a substantial federal question extends beyond the facts of the particular case to all similar cases." *Wright v. Lane County Dist. Ct.*, 647 F.2d 940, 941 (9th Cir.1981). *Cf. Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[T]he precedential effect of a summary affirmance can extend no farther than 'the precise issues presented and necessarily decided by those actions.' ... Questions which 'merely lurk in the record,' are not resolved, and no resolution of them may be inferred." (citations omitted)). Therefore, *Moore* may affect jurisdiction in a case involving lifetime term limits on state legislators.

One other circuit has considered this jurisdictional analysis. *Bates v. Jones*, 131 F.3d 843 (9th Cir.1997) (en banc panel) (*"Bates II"*), *vacating* 127 F.3d 839 (9th Cir.1997) (original panel) (*"Bates I"*), *cert. denied,* —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998). In *Bates II*, California imposed lifetime term limits on state legislators. Three judges addressed *Moore*. Judge O'Scannlain expressed "grave doubt" about the existence of federal jurisdiction, while Judges Reinhardt and Fletcher attempted to distinguish *Moore*. *Compare Bates II*, 131 F.3d at 847–48 (O'Scannlain, J., concurring) *with id.* at

869 n. 7 (Fletcher, J., dissenting in part) and *Bates I,* 127 F.3d at 851 n. 13 (Reinhardt, J.).

Despite doubts, we will not decide the propriety of jurisdiction. Michigan's counsel chose not to contest jurisdiction in the district court or in this court. Therefore, neither side has advised this court of their views on *Moore.* In addition, we need not decide the jurisdictional issue; because we uphold § 54 on the merits, our decision will have the same practical effect as if we decided this case on jurisdictional grounds, namely, to let § 54 stand. Therefore, setting aside the jurisdictional question, we turn to the other issues.

## III. Standing

■ To establish standing, a plaintiff must show, among other elements, the existence of an actual case or controversy. *Miyazawa v. City of Cincinnati,* 45 F.3d 126, 127 (6th Cir.1995). *See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An actual controversy exists where a plaintiff has "sustained or is immediately in danger of sustaining some direct injury as a result of [a law]." *Miyazawa,* 45 F.3d at 127 (citation omitted). The injury "must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* (citation omitted).

■ Here, the district court correctly found that all plaintiffs established standing. Michigan, however, contends that the potential injury is not immediate. It argues that if lifetime term limits are struck down, they could be replaced with a valid alternative, consecutive term limits. Consecutive term limits, like lifetime term limits, would prevent the term-limited representatives from running in this election, although they would allow those representatives to run in future elections. Therefore, Michigan contends that any injury will not occur until a future election.

■ Despite this argument, nothing in § 54's severability clause authorizes a court to replace lifetime term limits with consecutive term limits if it invalidates the lifetime limits. Without express authorization, a court may not reinterpret or limit language to make a provision constitutional. *Vittitow v. City of Upper Arlington,* 43 F.3d 1100,

1106 (6th Cir.1995). Because this court may not reinterpret § 54 to impose consecutive term limits, the individual plaintiffs face an immediate injury in the 1998 elections. This analysis also disposes of Michigan's ripeness and timing arguments.

■ Next, Michigan argues that the non-profit corporations lack standing. To establish associational standing, an organization must show, among other elements, that the interests it seeks to protect are germane to its organizational purpose. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The district court found that both organizations deal with voting rights and seek to ensure voting choice. We agree. Therefore, both corporations have standing.

## IV. The Merits

Having disposed of the preliminary issues, we turn to the merits. We review the district court's grant of summary judgment *de novo. Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 521 (6th Cir.1997). The relevant cases reveal two general approaches to term limits. In the more common framework, courts balance the state's interests against the burden on voters. In the other framework, courts uphold any qualifications unless they plainly violate the Constitution. Because we would uphold § 54 under either approach, we need not choose between the two, although we will discuss both.

### A. The Balancing Approach

■ In this approach, courts evaluate candidate eligibility requirements by balancing the state's interests against the individual voter's interests. *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (invalidating Ohio's early filing deadline for presidential candidates because they burdened newer and smaller parties); *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (upholding Hawaii statute that banned write-in voting). A court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into

account "the extent to which those interests make it necessary to burden the [voter's] rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564.

 Under the *Anderson-Burdick* balancing test, therefore, a court first must evaluate the extent to which a regulation burdens First and Fourteenth Amendment rights. The Supreme Court has identified two factors in determining whether a regulation burdens voting rights severely or only incidentally: content-neutrality and alternate means of access. *See Burdick*, 504 U.S. at 437–38, 112 S.Ct. 2059. First, and most importantly, a law severely burdens voting rights if it discriminates based on content instead of neutral factors. *See id.* at 438, 112 S.Ct. 2059. "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 792–93, 103 S.Ct. 1564. *See also Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (invalidating high candidate filing fees partially because they burdened a particular type of voter). Second, a law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot. *Burdick*, 504 U.S. at 436–37, 112 S.Ct. 2059. In this situation, the law impermissibly restricts "the availability of political opportunity." *Anderson*, 460 U.S. at 793, 103 S.Ct. 1564 (citation omitted).

 In evaluating the severity of the burden, the court also decides how much deference to afford the state's interests. If the regulations burden voting rights incidentally, or impose only "reasonable, nondiscriminatory restrictions," they receive a rational basis review. *See id.* at 788, 103 S.Ct. 1564. Under the rational basis review, a court usually will uphold regulations because "the state's important regulatory interests are generally sufficient to justify [them]." *Id.* On the other hand, if a regulation burdens voting rights severely, the regulation is

reviewed under the compelling interest standard. *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059. Under this standard, a court will uphold the regulation only if it is "narrowly drawn to advance a state interest of compelling importance." *Id.* (citation omitted). Based on this framework, we first evaluate the severity of § 54. We then discuss Michigan's interests, and whether Michigan has narrowly tailored § 54 to satisfy those interests.

**1. The Severity of the Burden**

 A voter has no right to vote for a specific candidate or even a particular class of candidates. *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 128 (6th Cir.1995); *Zielasko v. Ohio*, 873 F.2d 957, 961 (6th Cir.1989). Therefore, a state may permanently bar voters from voting for particular classes of candidates. *Zielasko*, for example, upheld age limits on municipal judges, even though the limits forever barred citizens from voting for an entire class of candidates, elderly judges. *Zielasko*, 873 F.2d at 961. Other lifetime bans on entire classes of candidates are also legitimate. *See, e.g., Chimento v. Stark*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973) (upholding residency requirements); *Nevada Judges Ass'n v. Lau*, 112 Nev. 51, 910 P.2d 898, 902 (1996) (upholding lifetime term limits for judges); *Dutmer v. City of San Antonio*, 937 F.Supp. 587, 589 n. 4, 592 (W.D.Tex. 1996) (upholding lifetime term limits for city councilmen).

 Indeed, many courts have addressed the precise issue in this case. Twenty-four federal judges or state supreme court justices have reached the merits of whether lifetime term limits for state legislators violate the First and Fourteenth Amendments. While legal reasoning is more about quality than quantity, we are, nonetheless, impressed by the overwhelming number of judges who have voted to uphold these term limits. Twenty-three out of the twenty-four judges voted to uphold them: nine judges on the Ninth Circuit Court of Appeals[1]; seven

**1.** *Bates v. Jones*, 131 F.3d 843 (9th Cir.1997) (en banc panel) (*"Bates II "*), *vacating* 127 F.3d 839 (9th Cir.1997) (original panel) (*"Bates I "*), *cert. denied,* —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998). The following judges reached the merits and voted to uphold the term limits: Thompson, Hug, Browning, Trott, Kleinfeld, O'Scannlain, Rymer, Hawkins, and Sneed. The following judges declined to reach the merits: Reinhardt, Fletcher, Schroeder, and Pregerson.

justices on the Supreme Court of Arkansas[2]; six justices on the Supreme Court of California[3]; and the district court judge in this case.[4] Only one lone district court judge has found these term limits unconstitutional—and he was reversed.[5] All twenty-three judges, including the district court judge in this case, found that lifetime term limits impose only an incidental, neutral burden. *Bates v. Jones*, 131 F.3d 843, 847 (9th Cir. 1997) (en banc panel) (*"Bates II "*), *cert. denied*, —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998); *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349, 360 (1994) (*"Hill "*); *Legislature v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 297, 816 P.2d 1309, 1323 (1991); *Citizens for Legislative Choice v. Miller*, 993 F.Supp. 1041 (E.D.Mich.1998).

Most importantly for the *Anderson–Burdick* analysis, lifetime term limits impose a neutral burden, not a content-based burden. Section 54 burdens no voters based on "the content of protected expression, party affiliation, or inherently arbitrary factors such as race, religion, or gender." *See Bates II*, 131 F.3d at 847. It burdens no voters based on their views on any of the substantive "issues of the day," such as taxes or abortion. *Citizens for Legislative Choice*, 993 F.Supp. at 1046–47. Apart from the term limits issue, voters who favor experience are not in any sense a recognized "group," and we are aware of no historical bias against incumbent politicians or their supporters.[6] *See League of Women Voters v. Diamond*, 965 F.Supp. 96, 102 (D.Me.1997) (term limits have no regard "to the law maker's ideas, gender, race, religion, or any other classification"); *Dutmer v. City of San Antonio*, 937 F.Supp. 587, 592 (W.D.Tex.1996) (under term limits, "no identifiable group . . . is adversely or uniquely impacted").

Furthermore, the plaintiffs have many other avenues to express their preferences. They can, in fact, vote for experience. They can vote for the term-restricted candidates for other offices. For the legislature, they can vote for former city councilmen, legislative aides, and many other candidates with political experience. Indeed, the plaintiffs may elect anyone who has served less than three terms in the state house. *Citizens for Legislative Choice*, 993 F.Supp. at 1045–46. Moreover, nothing prevents them from overturning § 54 through Michigan's constitutional processes, and thereby convincing others that experience counts.

Although the plaintiffs contend that § 54 burdens them severely, their theory proves too much. They argue that lifetime term limits burden an identifiable group of voters, those who favor candidates with significant legislative experience, for the benefit of another group of voters, those who favor novice legislators. To accept their view, however, every restriction would burden some identifiable group. For example, age ceilings permanently bar voters from electing another class of candidates, those with significant life experience. Under the plaintiffs' theory, voters who favor significant life experience are an identifiable group of voters, and age ceilings permanently, and unfairly, burden their voting choices.

While the plaintiffs concede that a state may impose age limits, they fail to persuasively distinguish age limits from term limits. They merely brand age limits "reasonable" and term limits "unreasonable." For example, they assert that "[a] reasonable qualification as to age, citizenship, [and] residency, ... precisely because it is reasonable, does not impose a 'severe restriction.'" Next,

**2.** *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349, 360, 363, 364, 367, 368 (plurality opinion and opinions of four other justices) (1994) (*"Hill "*). *Hill* upheld lifetime term limits for state legislators but invalidated them for congressmen. The United States Supreme Court affirmed *Hill*'s decision with respect to congressmen but did not address the validity of term limits for state legislators. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

**3.** *Legislature v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 303, 816 P.2d 1309, 1329 (1991).

**4.** *Citizens for Legislative Choice v. Miller*, 993 F.Supp. 1041 (E.D.Mich.1998).

**5.** *Bates v. Jones*, 958 F.Supp. 1446 (N.D.Cal.), *rev'd*, 131 F.3d 843 (9th Cir.1997) (en banc panel), *cert. denied*, —— U.S. ——, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998).

**6.** The plaintiffs never allege that they generally vote for incumbents, as opposed to merely wanting to vote for these two particular incumbents.

they point out that states have traditionally imposed age and the other "reasonable" qualifications. While we applaud this nod to tradition, term limits also enjoy a historical pedigree. *See Bates v. Jones*, 958 F.Supp. 1446, 1453–54 (N.D.Cal.1997) (noting that Pennsylvania enacted consecutive term limits soon after independence), *rev'd*, 131 F.3d at 847. Finally, Judge Fletcher distinguishes another type of age restriction, minimum age requirements, by arguing that they "help to ensure that a candidate can fully appreciate . . . the most basic interests of his constituency." *Bates II*, 131 F.3d at 871. We see no such clear distinction. Term limits, like minimum age requirements, may help ensure that a candidate will "fully appreciate" his constituency's basic interests.

Apart from its overly broad sweep, the plaintiffs' argument deteriorates even on its own terms. On the one hand, they complain that lifetime term limits prevent them from electing an entire class of candidates, those with experience. They then offer consecutive term limits as a more reasonable alternative. Consecutive term limits, however, would prevent voters from electing another class of candidates, those with recent experience. The plaintiffs do not explain why a state may restrict candidates based on recent experience but not overall experience.[7]

We also reject the plaintiffs' final argument. They contend that § 54 burdens another identifiable group, racial minorities and inner-city residents. They note that, in all of the districts with a majority of black voters, a majority of voters voted against the amendment. They also note that many representatives from these districts hold important leadership positions. Based on these facts, the plaintiffs hypothesize that § 54 disproportionately burdens blacks, because blacks must rely on experienced legislators to garner support for their policy preferences.

None of this evidence supports the plaintiffs' theory. They do not allege that § 54 was intended to hurt minorities. They present neither empirical nor anecdotal evidence that term limits hurt minority voters. On the contrary, § 54 burdens white suburban voters in the same manner as black inner-

city voters. The fact that many blacks voted against § 54 proves neither discriminatory intent nor impact. Nothing indicates that term limits will prevent their future representatives from obtaining leadership positions, or that current legislative leaders obtained their positions solely through longevity. Finally, some authority indicates that term limits may help minority interests: "[m]eretricious policies which sacrifice the well-being of economic, social, racial, or geographical minorities are most likely where a political figure . . . can rely upon electorate inertia fostered by the hopelessness of encountering a seemingly invincible political machine." *State ex rel Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607, 612 (1976).

### 2. Michigan's Interests

The State of Michigan has a compelling interest in enacting § 54. As a sovereign polity, Michigan has a fundamental interest in structuring its government. *E.g., Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Every court to address the issue has found that a State has a compelling interest in imposing lifetime term limits on state legislators. *E.g., Hill*, 872 S.W.2d at 360; *Eu*, 286 Cal.Rptr. at 301, 816 P.2d at 1327. Here, Michigan asserts that term limits are necessary to "maintain the integrity of the democratic system." Michigan asserts, among other interests, that lifetime term limits will foster electoral competition by reducing the advantages of incumbency and encouraging new candidates. According to Michigan, lifetime term limits will also enhance the lawmaking process by dislodging entrenched leaders, curbing special interest groups, and decreasing political careerism. We, of course, express no views on the wisdom of term limits, but we simply respect Michigan's views.

The plaintiffs do not seriously contend that Michigan lacks a compelling interest in structuring its government. Instead, they argue that, under the compelling interest standard, a State must identify its precise interests and not hypothesize justifications. They then

---

7. The plaintiffs take no position on term limits for state executive officers, another type of term

limit. They do not discuss how this case may impact executive term limits.

contend that the text of § 54, as presented to the voters, failed to articulate any electoral problems, and that Michigan enacted § 54 only to create a legislature of novices.

 This argument lacks merit. A State need not justify its laws with "elaborate, empirical verification." *Timmons v. Twin Cities Area New Party,* —— U.S. ——, 117 S.Ct. 1364, 1372, 137 L.Ed.2d 589 (1997) (upholding ballot limits despite lack of proven need). Moreover, nothing indicates that Michigan must rely solely on the text of the amendment to explain its interests, particularly in the term limits context. In *Maloney,* for example, the Court validated West Virginia's interests even though the State failed to document its rationale. *See State ex rel Maloney v. McCartney,* 159 W.Va. 513, 223 S.E.2d 607, 620 (1976) (Flowers, J., dissenting, complaining about the majority's decision). At least in the term limits context, the State's interests are well-known. The debate over term limits and "rotation" of candidates has continued since the founding of the republic. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 812, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).[8]

### 3. Narrow Tailoring

Michigan narrowly tailored § 54 to satisfy its compelling interests. Michigan asserts that only lifetime term limits will ensure a complete turnover of all legislative seats every few years, and that only lifetime term limits can erase all of the problems associated with incumbency. We defer to Michigan's judgment.

Contrary to the plaintiffs' assurances, consecutive term limits are not a viable alternative. *E.g., Eu,* 286 Cal.Rptr. at 301–02, 816 P.2d at 1327–28. Former incumbents would still retain important advantages in name-recognition and fund-raising, such as a proven ability to win and an organizational network. *Id.* Legislators might adjust their conduct, and bow to special interest groups, in the hopes of someday returning to office. *Id.* Moreover, some incumbents could arrange for "caretakers" to hold their offices for a short period of time, and thereby repeatedly return to office after only short absences. *Id. See also Nevada Judges Ass'n v. Lau,* 112 Nev. 51, 910 P.2d 898, 902 (1996) (noting that consecutive term limits may not achieve the desired rate of turnover).

Therefore, even if we found that lifetime term limits burdened voters severely, we would still uphold § 54 under the compelling interest standard. As a result, § 54 passes the *Anderson-Burdick* balancing test regardless of whether we apply rational basis or strict scrutiny. There is a question, however, whether the *Anderson-Burdick* test even applies. In the next section, we discuss the alternative.

### B. The Deferential Approach

 *Anderson* and *Burdick* implicate rights and interests related to, but fundamentally different from, the rights and interests involved in this case. *See Bates II,* 131 F.3d at 855, 858–59 (Rymer, J., joined by O'Scannlain, J., distinguishing ballot access issues from term limit issues). *See also id.* at 861, 869–70 (Fletcher, J., joined by Pregerson, J., agreeing that term limits present different issues). *Anderson* and *Burdick,* the two leading "ballot access" cases, involve the process of electing candidates. These cases define and limit a State's ability to impose certain types of regulatory procedures relating to the election process.

Term limits, on the other hand, implicate a different, and in some respects a far more important interest: the State's power to prescribe qualifications for its officeholders. *E.g., Gregory v. Ashcroft,* 501 U.S. 452, 463, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (upholding Missouri's mandatory retirement provision for elderly judges). As such, they involve the State's authority to structure its government. *Id.* Through lifetime term limits, the State of Michigan, and the voters of Michigan, chose a citizen legislature over a professional legislature. They chose a different type of polity based on a different type of representative.

---

**8.** In addition, it appears that Michigan did not have the option of describing its purpose at length. According to the joint stipulation of facts, Michigan requires its State Board of Canvassers to prepare a statement of purpose for a proposed amendment. This statement of purpose cannot exceed 100 words. *See* Mich. Const., art. 12, § 2, cl. 3.

■ As a sovereign, Michigan deserves deference in structuring its government. *See id.* at 460, 111 S.Ct. 2395. The Constitution commands deference: "the authority of the people of the States to determine the qualifications of their most important government officials ... is a power reserved to the States under the Tenth Amendment and guaranteed them by [the Guarantee Clause] of the Constitution." *Id.* at 463, 111 S.Ct. 2395. In *Bates II,* Judge Rymer developed a workable, deferential test for evaluating state decisions regarding their governmental structure. *Bates II,* 131 F.3d at 858–59. In this framework, a court should uphold a qualification "unless the qualification is plainly prohibited by some other provision in the Constitution." *Id.* at 859.

This framework grants the States the required deference, but still allows federal courts to invalidate qualifications that violate another constitutional provision. "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. 'It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive, and free from external interference, *except so far as plainly provided by the Constitution of the United States.'*" *Gregory,* 501 U.S. at 460, 111 S.Ct. at 2400 (citing *Taylor v. Beckham,* 178 U.S. 548, 570–71, 20 S.Ct. 890, 44 L.Ed. 1187 (1900)) (emphasis added). This approach also comports with *Moore,* which deferred to West Virginia's decision to impose term limits. *See Moore v. McCartney,* 425 U.S. 946, 96 S.Ct. 1689, 48 L.Ed.2d 190 (1976). It also comports with non-term limit cases that struck down other facially discriminatory qualifications.[9]

Nevertheless, the parties in this case confined their arguments to the *Anderson-Burdick* framework. As a result, we do not have the benefit of counsel in evaluating Judge Rymer's approach. Moreover, we find no

need to choose between the approaches, because we would affirm under either the balancing test or the deferential framework. Under either approach, our decision rests on the State's sovereign interest in structuring its government. It is an interest recognized by both the text of the Constitution and the spirit of federalism.

AFFIRMED.

---

**9.** *See McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978) (State cannot, consistent with the Free Exercise Clause, disqualify clergymen from serving in the legislature); *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (State cannot, consistent with the

First Amendment, disqualify antiwar activist); *Bates II,* 131 F.3d at 873 (Fletcher, J., dissenting in part, alluding to a Fourteenth Amendment floor in noting that "at the very least [ ] a State cannot discriminate in an invidious fashion against its citizens").